## KIMBELL MILLING CO. v. GREENE.

No. 14380.

Court of Civil Appeals of Texas. Fort Worth.

May 8, 1942.

Rehearing Denied June 19, 1942.

Charles Kassel and Melvin Adler, both of Fort Worth, for appellant.

A. B. Curtis and H. D. Payne, both of Fort Worth, for appellee.

SPEER, Justice.

A. S. Greene sued Joe F. Boothe, of Floyd County, Texas, and Kimbell Milling Company, a corporation, in a district court of Tarrant County, for the value of wheat alleged to have been converted by the defendants, during the year 1937.

Greene's suit was based upon allegations that he and several other parties, whose claims had been assigned to him, stored wheat with Boothe during 1937, and that without the knowledge or consent of the owners, Boothe had sold or in some manner

transferred said wheat to Kimbell Milling Company, to which company we shall refer as Kimbell.

The case was tried to the court, without a jury. Judgment was entered in favor of Greene for the value of 11,050 bushels of wheat at the stipulated price of $1.04 per bushel. Kimbell alone has appealed.

Some of the material uncontroverted facts in this case are: A. S. Greene, the plaintiff, and four or five persons from whom he took assignments of claims were grain raisers in Floyd County, during 1937, and had been for several years prior thereto. Joe F. Boothe had operated an elevator at Floydada for about 15 years. In 1935 he incorporated his business and he, his son and a brother owned the stock, until in 1936, when a small block was sold to a man in Dallas, Texas. Boothe was president and general manager of the corporation, called "Boothe Mill & Elevator, Inc.". Greene knew nothing of the corporation, but dealt with Boothe during 1937 in all matters in controversy. Boothe's elevator had a capacity of 10,000 or 11,000 bushels. When grain was received from the grower, a truck would be backed up to a chute and dumped. The grain fell to a lower level known as the truck pit, and by means of machinery was elevated. There were six separate bins for grain, and it could be elevated from the truck pits to either bin. A railroad track ran on two sides of the elevator and all shipments made by Boothe were loaded out into cars on these tracks. There was at least one other elevator in Floydada, located just across the street from Boothe's. There were other elevators in smaller towns of the county, within a radius of the area in which Greene and his assignors grew their grain. Boothe nor his successor, the corporation, never qualified as a public bonded warehouseman. No warehouseman's receipt was ever issued by Boothe to those who left grain in his elevator. He issued a scale ticket bearing the name of the hauler, the owner, amount of grain received and signed by him. If grain was not purchased by him, he initialed the receipt with an "S" or "St." and retained a carbon copy. The initial indicated to him that the grain had not been purchased by him. Some parts of the testimony indicate that the initial meant "stored".

There are certain stipulations in the record, many of which refer to what certain witnesses would testify, but few were

admitted by both parties as facts. We can only take them as controverted facts and look to the judgment entered to ascertain which theory was adopted by the court.

One of such stipulations which we think pertinent is, in substance, that during the year 1937, and for several years prior thereto, there was a general custom in the grain area including Floyd County, where small elevators were located and insufficient storage capacity was available to take care of the grain crop in the area, the small elevators would ship out the grain to large terminal elevators on the basis of either outright sale, or on storage, and in the case of storage, subject to advances made to the small elevators against the grain and to the absorption of the grain by the terminal elevator when such advancements, storage and other proper charges equaled the value of the grain. The stipulation, however, was qualified by additional statements to the effect that neither Greene nor his assignors knew of such general custom at the time they stored their grain with Boothe.

Kimbell (appellant) urges several points of error for reversal. Nine of the fifteen points presented are urged to show that judgment should have been entered for Kimbell and not for Greene, as was done. These are presented in points 2, 4, 5, 6, 7, 9, 10, 12, and 15. Their contents will be reflected by the following summary: (a) Since Boothe had an option to buy the wheat when Greene desired to sell, the deposit was ·a sale and not a bailment, and Kimbell being an innocent purchaser, got title under his dealings with Boothe. (b) Dealings between Greene and Boothe constituted Boothe the agent of Greene, with apparent authority to sell the wheat and Kimbell, having purchased without notice of anything to the contrary, got the title. (c) Possession having passed to Boothe with apparent power to sell, a secret agreement between Boothe and Greene that the wheat should remain the property of Greene was not binding on Kimbell, who without notice thereof purchased from Boothe. (d) Greene took from Boothe advancements made by Kimbell on the wheat, under general customs of trade, and Kimbell being an innocent purchaser, should have had judgment. (e) Under the general custom practiced in that area, Boothe had a right to ship the wheat out to Kimbell as he did, and when advances made to

Boothe by Kimbell, storage and other proper charges, absorbed the value of the wheat, Kimbell acquired good title and should have recovered judgment. (f) Boothe's elevator being too small to accommodate the storage of all grain in the area, and wheat being subject to damage and of a perishable nature, Boothe had a right to ship it to a large terminal elevator and sell it, under the custom of the country, to prevent loss and deterioration: having done so, and Kimbell having no knowledge of any secret contract made by Boothe with Greene, acquired good title and should have recorded judgment. And (g) Greene dealt with Boothe individually and not the corporation, and Kimbell acquired title from the corporation; therefore Kimbell should have prevailed.

No findings of fact were filed by the trial court and none are recited in the judgment. Most, if not all, the facts bearing upon the points urged by Kimbell for reversal, although supported by substantial testimony, are denied and controverted by Greene and his assignors; the judgment being in favor of Greene, it must follow that the court believed the theory of Greene. It would unnecessarily extend this opinion to quote the testimony even upon the most highly controverted points. But whether or not Greene and his assignors deposited their wheat with Boothe in the ordinary course of business as it was customarily done, in the manner relied upon by Kimbell, or whether it was deposited under special contracts differing from the general custom, we think are controlling in the disposition to be made of this appeal.

Greene and his assignors said they had done business with Boothe for several years in the past; had sold him wheat and had left it there to be sold at a later date when the market price suited them; they dealt with Joe F. Boothe and knew nothing about his business being incorporated. In previous years they had hauled their wheat to Boothe's elevator, unloaded it and when they had finished hauling the crop, would go in to town and tell Boothe that they wanted to sell all or a designated amount at the prevailing price and wanted to hold the remainder for better prices; any time in the future they desired to do so they would ascertain if Boothe would give them as much for the wheat as any else and if so, they sold it to him; Boothe had always paid them the prevailing price when they desired to sell, but if he had not they always believed they could have sold to some one else;

Boothe was not obligated to buy their wheat; all he would have to say was that he would not pay the price they asked or did not want to buy; they had no agreements with him to give him an option over others to buy, but because he had never charged storage they had sold to him at the prevailing market price. A very large grain crop was grown in Floyd County in 1937; all the granaries and elevators in the county would not contain the yield at one time. They knew that many were selling their grain and that Boothe was shipping out; they did not know that any other persons were storing their grain with Boothe as they were. Boothe had told them his elevator was of 16,000 bushels capacity and that he would store their grain without charges; that these were special arrangements made that year, unlike any they had ever had with him in previous years. While it was not definitely stated that their wheat would not be mixed with that of any other person, they understood from Boothe that he had sufficient space to store their grain separately and would hold it subject to their calls or orders; they did not examine the inside of the elevator, but knew it had separate bins, and that when grain was dumped into the same pit by owners, the elevator chains and cups carried the grain up and emptied it into different bins. That under their arrangements with Boothe, if they chose to do so, they could go there and get their wheat for planting or any other purpose they desired to use it; none of the parties whose interest Greene represented ever authorized Boothe to ship their wheat out, and did not know he had done so until after he failed in business. They had not authorized Boothe to sell or otherwise dispose of their grain. They had not sold it nor authorized any other person to do so. They had the amount of grain on storage with Boothe that Greene sued for. Neither of the depositors knew anything about the general custom prevailing among country elevators and the larger ones at central points, whereby the former would ship grain to the latter, agreeing to pay storage and other charges thereon, and if these charges and advances to the small dealer absorbed the value of the grain, the larger elevators could take it over as their own. They knew Boothe was not a man of great wealth, but that he was buying and selling grain in season, and they supposed he got his means from sales or advancements made on his own grain. One or more of the depositors said Boothe told them that they could leave wheat there until next harvest time if they desired, and could then call for the original wheat if they wanted it. They could sell it to anybody they chose, since it was to remain their wheat.

Joe F. Boothe testified and in most instances contradicted the testimony of Greene and his assignors. He said, in substance: that he had done business with these parties for several years prior to 1937, sometimes buying their grain and at other times receiving it in the elevator and at a later date if they desired to sell they would come in and inquire about prices and they had always agreed upon the price to be paid and he bought their grain. He made no different arrangement with them in 1937 to that of previous years. That he had never agreed with Greene and the others to hold the wheat at Floydada; that he had no direct authority from the depositors involved here to sell or ship the wheat out, except under the general custom he had practiced in previous years. That it would have been humanly impossible to have stored in his elevator all the wheat that was brought to him during the 1937 season. He never did tell any one that he would keep his wheat there in the elevator as long as he wanted to leave it there. He was not a bonded warehouseman nor did he ever issue a warehouseman's receipt. He said several times, in some instances not in response to questions asked, "I never did take wheat to turn back". He identified checks which he had delivered to Greene and his assignors for wheat purchased by him during the 1937 season. All wheat received went into the same hole and he was shipping out all the time. Cars were being loaded from the elevator nearly every day and they could be seen by any one who cared to look. That with these depositors, he always had the agreement with them that there would be no storage charges, but when they got ready to sell he would either pay them the prevailing market price for their grain or they would be entitled to their wheat back. None of the depositors had ever in the past asked for the return of their wheat. His understanding of past agreements with the depositors was that they would leave their wheat there until they were ready to sell and they would come in and he would pay them the prevailing market price. That the wheat that these depositors left with him in 1937 was not his; it did not belong to him. He never did tell Kimbell that part of the wheat shipped to

it by him was on storage with him by these depositors; he did not tell the depositors that he was shipping their wheat to Kimbell, nor did he tell them that he was mixing it with other wheat.

Article 5568, R.C.S., provides, among other things, that any person, firm or corporation receiving wheat or other articles of merchandise in store for hire, shall be deemed to be public warehousemen. Subsequent articles immediately following the one cited provide the duties, restrictions and privileges of public warehousemen, as well also liability of those who deal with them. It was conclusively established in this case that Boothe did receive wheat for storage but not for hire. This being true, we know of no reason why a private individual or corporation cannot become a bailee of another's property. If, as indicated by the holding in Longwell Transfer v. Elliott, Tex.Civ.App., 267 S.W. 346, writ refused, all persons contracting as did Boothe are public and not private warehousemen, whether they comply with the requirements of statute or not, it remains that both Greene and Kimbell dealt with Boothe as he was, charged with notice that he had not been bonded and licensed to issue public warehousemen's receipts, and that he had issued none. Boothe and Kimbell could not escape liability from conversion by bailee because Boothe had not qualified to perform all the functions of a public warehouseman.

If the testimony of Greene and his assignors is to be believed (and the judgment of the court is to the effect that it was found to be true), they stored wheat with Boothe, the president and general manager of the corporation, under the belief from their special contract with him, that the title of the grain remained with them and was to be subject to their orders at all times; that they could sell it in the future to Boothe or to any other person, or could come and get their wheat, at their will and pleasure; that they believed their wheat was stored in separate bins, that is, that it was not mixed with the common mass. Boothe testified in effect that the grain belonged to the depositors at all times—that it was never his. True, he said he never took grain to be returned, but this statement is susceptible to more than one construction; whether he ever expected to return the wheat if the owners called for it would be of no consequence in this case, if he had obligated himself to return it upon their demand. His statement may also be construed to mean that he expected the depositors, at some time, to sell their grain, and since it was in his possession he felt perfectly confident he would be able to buy it. Clearly the arrangements made by the depositors of the grain with Boothe did not amount to an option by Boothe to buy the grain at some future date, to the exclusion of their right to sell to some other person, or even to remove the grain from storage for planting or other purposes. The effect of the judgment by the trial court is that he found the facts contended for by Greene to be true and since the facts were controverted we are bound by the findings of the trial court, sitting in lieu of a jury. 3 Tex.Jur. page 1102, section 771; Corn v. First Texas Joint Stock Land Bank, Tex.Civ.App., 131 S.W.2d 752, writ refused. Under the facts as disclosed by this record, we hold that the relation between Greene and Boothe was that of bailor and bailee, and not that of creditor and debtor—that the contract was one of bailment and not a sale of the grain.

Any disposition made by Boothe, the bailee in this case, of the property of the bailor, which deprived the latter of his right of title and possession, was a conversion for which the bailee was responsible to bailor, and all who participated in the transfer and disposition thereof are likewise liable. Oats v. Dublin National Bank, 127 Tex. 2, 90 S.W.2d 824, 827. The cited case was one involving the sale by a mortgagor of property covered by a valid mortgage lien to the detriment of mortgagee, but we can see no difference in the principle involved.

Kimbell contends that it had no notice of any secret or unusual contract of storage existing between Greene and Boothe, but relied upon a general custom prevailing in Floyd County and other counties in the area producing large quantities of grain. It must be borne in mind that Greene and those whose claims he purchased knew nothing about such customs. Persuasive in support of Greene's contention, we find that he stored his grain with Boothe partly because there was to be no storage charges; yet if Kimbell's contention should prevail, this motive prompting Greene to store his grain would be defeated, in that Boothe would be permitted to promptly store the grain with Kimbell and start a storage charge running against

the grain, and permit Boothe to procure advancements thereon with accumulating interest, and when the storage, advances, interest and customary charges thereon amounted to the value of the grain, Kimbell would own it and Greene would have lost his grain without having received anything in return for it. It is contended by Kimbell that Greene was estopped to recover against it in this suit because he received certain of the advancements made to Boothe on the grain. This is not supported by the record. Greene did receive certain checks from Boothe but it does not appear that they were for the grain in controversy. We think Boothe had no title to the grain, nor did he have a right under the contract with Greene to dispose of it either directly or indirectly. Kimbell got no better title from Boothe than Boothe had a right to transfer. Dunagan v. Griffin, Tex.Civ.App., 151 S.W.2d 250, writ dismissed; Climber Motor Corp. v. Fore, Tex.Civ.App., 273 S.W. 284; City Nat'l. Bank of Eastland v. Conley, Tex. Civ.App., 228 S.W. 972. The mere fact that Kimbell found Boothe in possession of the grain did not warrant an assumption by it that Boothe was the owner and had a right to make disposition of it. 2 Tex.Jur., page 435, section 46. It is the general rule in this state that one who buys property must, at his peril, ascertain the ownership, and if he buys from one who has no authority to sell, his taking possession in denial of the owner's right is a conversion. Nunn v. Padgitt Bros., Tex.Civ.App., 161 S.W. 921, 923, and authorities there cited. Referable to Kimbell's contention that the dealings between Greene and Boothe constituted the latter the agent of the former with apparent power to sell, the rule appears to be that "Persons dealing with an assumed agent * * * are bound, at their peril, to ascertain, not only the fact of the agency, but the extent of his authority". First Texas Joint Stock Land Bank v. Holloway, Tex.Civ.App., 77 S.W.2d 301, 303, and cases cited. The fact that it would have been impossible for him to have stored the depositors' wheat and keep it separate from other grain, as testified by Boothe, would not afford a defense by him or those holding under him in an action for breach of the contract, if, as testified by Greene, he had no knowledge at the time of Boothe's inability to perform it. Embry v. Lewis, Tex.Civ.App., 19 S.W.2d 87.

Kimbell relies upon such authorities as Stricklin v. Rice, Tex.Civ.App., 141 S.W. 2d 748; Henderson Grain Co. v. Russ, 122 Tex. 620, 64 S.W.2d 347, and Kipp v. Goffe & Carkener, 144 Kan. 95, 58 P.2d 102, 108 A.L.R. 918 and other similar cases. To read those cases is to mark their distinction under the facts from the one before us.

In Stricklin v. Rice, supra, there was a written contract between the owner and storer by which the owner reserved the right to get Sudan seed from the elevator when needed if the storer could not pay a price equal to that offered elsewhere, and the elevator company reserved the right to buy if he could meet the price offered by competitors. Storage charges were agreed upon and the contract was construed to be one of sale and not of storage only. There was the option given to the elevator to buy. The controlling questions in that case do not appear in the one before us. The case above discussed cited Henderson Grain Co. v. Russ, supra. That case was one involving venue and the Supreme Court based its holding upon facts different from those here presented. Court discussed it as if the facts revealed that when the grain was deposited the owner did not contemplate that it would be kept separate from other grain, and that it was not contemplated that the owner would get back the grain deposited by him. The testimony in the instant case is sufficient to support a different intention by the parties.

Kipp v. Goffe & Carkener, supra, deals largely with a Kansas statute which makes it a penal offense for one who falls within the class of "Public Warehouseman" to transact the business of a warehouseman without complying with the provisions of that law. The depositor was charged with knowledge of the law and because the elevator was operating in violation of law its contracts with the depositor in that case were unenforceable. For the reasons stated, we have concluded that the nine points discussed should be overruled.

There are additional points presented, and under their respective numbers, they are, in substance, as follows: (3) The evidence is insufficient to show that wheat alleged by Greene to have been stored was ever transferred to Kimbell, since Boothe was buying grain all the time and grinding wheat and the amount so bought and ground was not established. (8) Although

Boothe was not a public bonded warehouseman, the sale and transfer of the wheat by him to Kimbell, an innocent purchaser, passed the title to Kimbell. (11) Boothe not being a licensed and bonded warehouseman, and Greene being charged with notice of that fact, it was against public policy for Greene to maintain this suit against Kimbell. And (13) If judgment should be rendered against Kimbell for any sum the amount should be reduced by four cents per bushel for handling at Floydada.

We have considered each point raised by the appellant, Kimbell Milling Company. A discussion of the several additional points not already referred to would involve a repetition of much that has already been said. We believe the conclusions above expressed are controlling and render it unnecessary to say more. There is ample testimony of probative effect which, if believed by the trial court, supports the judgment entered. We therefore overrule all points presented and the assignments of error to which they relate, and order that the judgment of the trial court be affirmed.

### On Motion for Rehearing.

Among the many grounds urged for rehearing by Kimbell Milling Co., our attention has been called to an expression in our original opinion, which must be corrected. We assume full responsibility for the error. We stated that "judgment was entered in favor of Greene for the value of 11,050 bushels of wheat at the stipulated price of $1.04 per bushel". As a matter of fact, the statement is a fair résumé of the holding except that the number of bushels was 11,050½. We inadvertently overlooked the provisions of the subsequent judgment or order overruling Kimbell's amended motion for new trial, in which the original judgment was amended and reformed, for reasons recited in the order to the effect that in the valuation placed on the wheat at Fort Worth, Texas, an item of 21 cents per bushel was added for the freight charge from Floydada to Forth Worth, Texas, and by the judgment so reformed, Greene was allowed recovery for 11,050½ bushels of wheat at 84 cents per bushel, the market value at Floydada, Texas, the place where Boothe and Kimbell converted it. We therefore withdraw the above-quoted statement taken from the original opinion, and will treat the judgment of the trial court as amended and reformed by it.

Irrespective of any added value the wheat may have had at Fort Worth, Texas, after the conversion, whether it was occasioned by added freight charges or not, Greene would not be entitled to recover that excess amount. In its motion before us, Kimbell urges that an additional three cents per bushel should be deducted from any recovery by Greene because of handling charges at the time Boothe delivered the wheat to Kimbell. Certainly Greene had nothing to do with that deal, but it is his theory that it was all without his knowledge or consent. We therefore overrule the contention of Kimbell in this respect.

Counsel for Kimbell respectfully suggests they do not believe we would want our opinion to rest upon an erroneous impression of the facts, and then call our attention to several instances believed by them to justify the contention that we had done so. We had occasion to mention what was found in the record as a stipulation, which reads: "That under a general custom of many years standing * * *." In referring to that statement, we said it in substance provided that for "several" years prior to 1937, a general custom prevailed in the grain area. We think a reference of "several years" to the custom is not so far from an expression like "many years" as to materially alter its meaning.

Our attention is called to our language in connection with that purported stipulation, where we said: "The stipulation, however, was qualified by additional statements to the effect that neither Greene nor his assignors knew of such general custom at the time they stored their grain with Boothe." Counsel complains of the language used as not being supported by the record and says: "The stipulation merely was that the plaintiff did not admit that such custom was known to Greene and his assignors." They say our statement is "an absolute contradiction of the record". Neither we nor counsel attempted to quote the language actually used; we only stated what we believed to be the "effect" of it. Following the statement which was termed a stipulation, the wording referred to is as follows: "But it is not agreed by plaintiff but on the

contrary is denied that such custom was known to plaintiff, and those whose claims he holds, at the time of the deposit of such grain by such parties in Boothe Mill & Elevator Co.", etc. We do not consider our language is an absolute contradiction of the record, but that it is substantially correct as stated by us.

We are criticised for saying, "It was conclusively established in this case that Boothe did receive wheat for storage but not for hire". There are many parts of the record shown in the testimony of Greene, as well as by Boothe, to support our statement. It is argued that because there was a custom of charging three cents a bushel for handling if Greene should sell to some one other than Boothe, this charge would constitute an indirect charge for storage. Since Greene did not sell his wheat to any other person, and there is no evidence of any intention on his part to do so, it cannot be said that such custom constituted a charge for storage in this case.

It is claimed that the record does not support our statement that "Greene and his assignors believed their wheat was stored in separate bins". Greene did say in substance that he had never been inside the elevator but by other parts of his testimony he said in substance that Boothe had told him that the bins had been treated to prevent wevils, and that this statement was a further inducement for him to store there. He further testified that he knew that the machinery elevated wheat up from the dump pit and the cups would empty it into bins and in this way he "figured that it was put in the elevator in separate bins, and not all in one". He admitted that he did not know much about the manner in which it worked.

 Kimbell assigns error in its motion to our overruling other points raised by it on the original hearing. Some of these points were overruled by us without detailed discussion. We now think point No. 8 should have our notice. In that point the question was raised and seriously urged that Kimbell should have recovered judgment in the trial court, because even though it be shown that Kimbell did receive a large quantity of wheat from Boothe, it was not shown that Kimbell did in fact receive the identical wheat Greene claims to have stored with Boothe. For, it is contended, that Boothe was grinding wheat at all times involved, and the amount so ground was not established, nor was it shown that the wheat so ground was not that claimed by Greene to have been converted. We think the testimony of Boothe establishes the fact that he did not grind any part of Greene's wheat claimed to have been stored, as distinguished from wheat actually bought and paid for by Boothe. After many questions were asked and answered relating to grinding by Boothe, this question and answer appear in the testimony: "Question: Well, in that common mass when you were running that mill, you used actual wheat in there that the Boothe Mill and Elevator Company had bought and paid for? Answer: Yes, sir." This evidence, we think, is sufficient to support the court's finding which in effect was that Boothe did not grind any part of the wheat in controversy.

 The motion contains parts of the testimony given by Greene and his assignors which tend to show their understanding of customs prevailing in that wheat area as relating to wheat raisers and local elevator companies. Greene's testimony shows that he only dealt with Boothe in such matters from 1928 or 1929 up to 1937, when he claims to have had a special arrangement with Boothe in regard to his grain stored. He said he knew nothing about any arrangements other people had with Boothe over that period but knew only of his own. He distinguished the relationship existing from 1928 to 1936, inclusive, from that had in 1937. The testimony of his assignors, in the main, was to the same effect, except that some had dealt with Boothe longer than between the years mentioned. The testimony of each cannot be harmonized in all respects. A fair construction of what they said in some instances contradicts other parts, but such contradictions do not destroy those parts contrary thereto, they only raise issues of fact for determination by the court sitting in lieu of a jury. New St. Anthony Hotel Co. v. Pryor, Tex.Civ.App., 132 S.W.2d 620, writ refused; Le Master v. Fort Worth Transit Co., Tex.Sup., 160 S.W.2d 224. Taken as a whole, there is evidence of probative value to support the judgment of the trial court. In determining this, those parts of the testimony contrary to the facts believed by the trial court must be disregarded, and we must look alone to that which did support the judgment and the testimony will be considered in its most favorable light in support of the judgment.

Long-Bell Lumber Co. v. Bynum, Tex. Com.App., 158 S.W.2d 290. In cases like this, the court is the trier of the facts and appellate courts will not substitute their opinion on the testimony for that of the trial court. The last above-cited case supports this statement of the law. See, also, 3 Tex.Jur. p. 1102, sect. 771.

We believe a proper disposition has been made of this appeal, and with the foregoing comments and correction of our judgment, the motion for rehearing is overruled.