KIMBELL MILLING COMPANY V. A. S. GREENE.

No. 8021. Decided March 17, 1943.
Rehearing overruled April 28, 1943.
(170 S. W., 2d Series, 191.)

*See Rules 483, Texas Rules of Civil Procedure, 136 Texas 589.—Reporter.

*Charles Kassel* and *Melvin F. Adler,* both of Fort Worth, for petitioners.

It was error for the Court of Civil Appeals to hold that the plaintiff and his assignors were not estopped to assert against the defendant (petitioner in Supreme Court) a secret agreement contrary to the usual course of dealing, upon which petitioner was entitled to rely, and did rely. Potter v. Mt. Vernon Roller Mills Co., 101 Mo. App. 581, 73 S. W. 1005; Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618; Risien v. Brown, 10 S. W. 661.

*H. P. Payne* and *A. B. Curtis,* both of Fort Worth, for respondent.

The bailment contracts of respondent (plaintiff below) 'and his assignors with Boothe were made in the usual course of business and are enforcible. American Natl. Ins. Co. v. Tabor, 230 S. W. 397; Girand v. Kimbell Milling Co., 116 Fed. (2d) 999; Security Natl. Bank of Dallas v. Farmers' Ed. & Co-op. Warehouse Co., 185 S. W. 649; First Texas Jt. St. Bank v. Holloway, 77 S. W. (2d) 301.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

A. S. Greene and several other wheat growers stored their 1937 wheat crop with Boothe Mill & Elevator, Inc., at Floydada in Floyd County. The elevator company sold the wheat to Kimbell Milling Company, of Fort Worth. Later Boothe Mill & Elevator, Inc., became insolvent. The other wheat growers assigned their rights to Greene, and he brought this suit against Kimbell Milling Company to recover the value of said wheat. The Court of Civil Appeals affirmed a judgment in favor of the plaintiff. 162 S. W. (2d) 991.

The first material question to be determined is whether the transaction between the wheat growers and Boothe Mill & Elevator, Inc., amounted to a sale or to a bailment of the wheat.

The trial of the case was before the court without a jury. No findings of fact were filed. Under these circumstances we must view the evidence in the light most favorable to the judgment of the trial court. We have examined the evidence very carefully. It would serve no useful purpose to restate it here. It is sufficient to say that the evidence, when construed in the light most favorable to the judgment, justifies the trial court's implied finding that the wheat was stored with Boothe Mill & Elevator, Inc., with an option in favor of the wheat growers to accept the price that Boothe would offer them or to demand surrender of the wheat, as they liked.

The rule of law applicable in this situation is thus stated in American Jurisprudence:

"*Sec. 51.—Effect of Depositor's Option.*—Where the depositor has an option either to demand a redelivery of the identical grain, or other grain of like kind and quality, or to sell to the warehouseman or to anyone he chooses, the warehouseman being required to hold the property until the depositor demands its return or sells it, it is generally held that until such time as the depositor exercises his option to sell, the transaction constitutes a bailment and not a sale. * *"

"*Sec. 52.—Effect of Warehouseman's Option.*—Where grain is delivered to a warehouseman, who mixes it with that of others, under an express contract, or a contract implied from the usual course of business, that when the depositor chooses to call for it the warehouseman will have the option to pay the highest market price or return an equal amount of grain of like quality, the general rule is that the transaction will not be deemed a bailment, but rather, á sale with an option on the part of the purchaser to pay either in money or in property as stipulated. * *" 6 Am. Jur., p. 183, Secs. 51, 52.

See also Stricklin v. Rice (Tex. Civ. App.), 141 S. W. (2d) 748; 67 C. J. 455; Annotation 54 A. L. R. 1166.

█ In other words, the rule seems to be that if the depositor has the option of electing whether he will accept the market price of the grain or a return of grain of like quality, the transaction constitutes a bailment; but if the option to pay for the grain at the market price or return of grain is with the warehouseman, the transaction is a sale.

Since the grain growers in this instance deposited their grain with the elevator company, with the option in their favor to accept the market price of the grain or demand a return of the grain, the transaction amounted to a bailment, and not a sale.

The defendant, Kimbell Milling Company, here contends that the plaintiff is estopped to assert its alleged bailment contract to recover as against said defendant.

The above contention seems to be based on two theories, the first of which is that at the time in question there prevailed a general custom by which operators of small country elevators accepted grain from their depositors with an option to buy it, and then shipped it out to large terminal elevators on the basis of either an outright sale or storage, and that plaintiff Greene, and those whose claims he holds, having deposited their grain with Boothe's elevator company with full knowledge of this custom, are now estopped to claim that the grain here involved was deposited under a special agreement, contrary to the general custom, that they retained for themselves the option either to sell their grain to Boothe's company, or to demand it back. The parties stipulated with reference to the custom as follows:

"That under a general custom of many years standing existing at Floydada, Texas, and generally in the wheat raising sections of Texas, where small country elevators were in operation, and which small country elevators were insufficient in capacity to take care of the grain crops in such sections, such small elevators were accustomed to ship out the grain to large terminal elevators on the basis of either an outright sale, or on storage, and in the case of storage, subject to advances to the small country elevator against the value of such grain and to the absorption on such grain by the terminal elevator when such advancements and storage and other proper charges equalled the value of the grain, but it is not agreed by the plaintiff but on the contrary denied that such custom was known to plaintiff, and those whose claims he holds, at the time of the deposit of such grain by such parties in Boothe Mill & Elevator, Inc., nor up to and after the time such grain was shipped to Kimbell Milling Co. or that such custom could apply to this case, or that any evidence of such custom would be admissible for any purpose in this case."

The plaintiff, Greene, testified that he knew of the custom, but did not understand that it applied where, as in this case, he had a special arrangement to store his grain in the local elevator

after the rush of the harvest season, when he thought there was ample room to keep his particular grain in storage there. The other grain growers testified that they were unfamiliar with the custom, and that they each had a specific agreement that their grain should be kept in storage in Boothe's elevator. Both Greene and his assignors testified that they thought Boothe had sufficient space to store their grain there. It is not shown that either Greene or his assignor had any reason to believe that the grain involved in this suit would be shipped out or that Kimbell Milling Company or anyone else would buy it in reliance upon the custom. Consequently, the custom can afford no basis for an estoppel.

The second theory of estoppel is based on the assertion that Boothe Mill & Elevator, Inc., contracted to store the wheat for hire, and in so doing was attempting to do business as a public warehouseman, and since it had not qualified as such, the storage contracts between it and the grain growers were void, and the plaintiff is now estopped to rely thereon.

Article 5568, Vernon's Ann. Civ. St., reads in part as follows:

"Any person, firm, company, or corporation who shall receive cotton, wheat, rye, oats, rice, or any kind of produce, wares, merchandise, or any personal property in store for hire, shall be deemed and taken to be public warehousemen."

Article 5569 provides that before the proprietor of any publice warehouse shall transact any business as a public warehouseman, he shall file with the County Clerk a bond and receive a certificate authorizing him to act as such. Other statutes prescribe the form of the receipt to be issued by a public warehouseman. Article 5577 reads as follows:

"Nothing in this law shall be construed to apply to private warehouses or to the issue of receipts by their owners or managers under existing laws, or to prohibit public warehousemen from issuing such receipts as are now issued by private warehousemen under existing laws. Such private warehouse receipts issued by public warehousemen shall never be written on a form or blank indicating that it is issued from a public warehouse, but shall, on the contrary, bear on its face, in large characters, the words, 'not a public warehouse receipt.' "

■ Boothe Mill & Elevator, Inc., had not qualified under the statute to operate as a public warehouse. Said corporation made no regular storage charge for storing the grain in question. The grower usually sold to Boothe the wheat stored in his elevator

because he paid them as much as anyone else for it, but it was understood that if the wheat was withdrawn by the grower, or sold to someone else, the elevator company would receive a "handling charge" of three cents per bushel. While this was not, strictly speaking, a storage charge, we shall assume that the elevator company was not a gratuitous bailee. Citizens National Bank of Jasper v. Ratcliff & Lanier (Com. App.) 253 S. W. 253. We do not think that it necessarily results, however, that the elevator company was operating a public warehouse. Article 5577, quoted above, seems expressly to authorize the operation of private warehouses for the storage of goods and the issuance of receipts therefor, so long as the proprietor does not undertake to issue "public warehouse receipts." The statute prohibits a public warehouseman from issuing private warehouse receipts unless clearly marked "not a public warehouse receipt," but it expressly states that it does not apply to private warehousemen. It cannot be said that a private warehouseman is allowed to store only such goods as are not mentioned in Article 5568, quoted above, relating to public warehousemen, for that article covers every kind of "personal property." It is apparent, we think, that it was the intention of the Legislature to merely prohibit the issuance of public warehouse receipts unless and until the provisions of the statute have been complied with, and that the statute was not intended to prohibit the operation of a private warehouse, such as was operated by Boothe Mill & Elevator, Inc. The contract therefore was not void.

The defendant relies heavily on the case of Kipp v. Goffee & Carkener, 144 Kan. 95, 58 Pac. (2d) 102, 108 A. L. R. 918. That case, however, is distinguishable from the case at bar in two particulars. The statute there under consideration provided that no person could lawfully engage in the business of storing grain for hire for the public without complying with the law relating to public warehousemen; and heavy penalties were provided for violation of the law. Apparently it was not permissible in that State, as it appears to be in Texas, to store grain with a private warehouseman. In addition, the court there construed the evidence as showing a sale and not a bailment of the wheat. This is clearly shown from the following statement taken from the opinion:

"In this case the evidence is open to the construction that plaintiff took his wheat to the elevator without any intention of having it returned to him, or exercising any control over it, but with the intention of taking his scale tickets to the elevator when the price suited him and receiving pay for it. He could do that lawfully, if he were selling his wheat. Even if he had the

option to receive grain of like kind and quality, or the cash, it would constitute a sale under Bonnett v. Farmers' & Growers' Shipping Association. 105 Kan. 121, 181 P. 634."

Since the contract between the grain growers and Boothe Mill & Elevator, Inc., was a bailment, and said bailee had no right to sell the grain to Kimbell Milling Company, said Kimbell Milling Company was liable to the growers for the value thereof.

The judgments of the trial court and Court of Civil Appeals are affirmed.

Opinion delivered March 17, 1943.

Rehearing overruled April 28, 1943.