**WORLD BROADCASTING SYSTEM, Inc., Appellant,**

v.

**Clark BASS et al., Appellees.**

No. 7069.

Court of Civil Appeals of Texas.

Texarkana.

Nov. 11, 1958.

Rehearing Denied Feb. 10, 1959.

Second Motion for Rehearing Overruled March 3, 1959.

Wear & Wells, Paris, for appellant.

Alan B. McPheron, Durant, Okl., Tibby B. Wright, Bonham, for appellees.

CHADICK, Chief Justice.

This is a suit upon a judgment as for debt, and the trial court judgment denying relief is affirmed.

The World Broadcasting System, Inc., a New York corporation, as plaintiff in the District Court of Fannin County, sued Clark Bass, Mary Jane McPheron and joined her husband, Alan B. McPheron, pro forma, all residents of Oklahoma, as defendants to recover the amount of a money judgment such plaintiff had theretofore recovered in a suit against the Bonham Publishing Company, a Delaware corporation, which was dissolved just after suit against it was commenced and before judgment was entered.

The World Broadcasting System, Inc., alleges "that by virtue of V.A.T.S. Articles 1390 to 1934, these Defendants, jointly and severally, became Trustees of the creditors of the Delaware Corporation as the result of their actions herein enumerated to the extent of the property and effects that have and shall come into their hands." The remainder of the petition pleads facts which it alleges brings the action within the scope of the articles named. The pleadings and relief sought indicate that the benefit of Article 1388 is also sought. While the petition alleges facts, which the trial judge ruled as sufficient to proceed to trial upon, it is clear that fraud is relied upon in part for recovery as shown by this quotation from appellant's brief:

"All of these actions were but the puppet manipulations by the appellees for they held, and still hold, the strings, including the purse strings, of the dissolved Delaware Corporation and the newly created Texas Corporation. The appellees directed the entire movement whereby the Delaware Corporation became a dummy, emasculated, bankrupt corporate shell to the detriment of all of its creditors in general, and this appellant in particular. These actions by the appellees constituted, were and are legal fraud and were so intended by appellees. All these acts carried out the implicit, expressed, demanding directions and requirements of appellees themselves. It was the hand of Esau but the voice was Jacob's."

The suit being in essence upon the theory that such defendants were in fact, if not in name, the President and Directors or Managers of the affairs of the corporation at the time of its dissolution and as such held the corporate assets as trustees for the benefit of creditors and that as stockholders they had in their hands assets of the dissolved corporation sufficient to pay the judgment sued upon.

All parties agreed in the trial court that the evidence raised no jury issue. The facts, as developed by the testimony, exhibits and stipulations of the parties, are rather involved and will be stated in the progress of the opinion only in sufficient detail to make understandable the disposition here made of the case. The defendants below and another who is not a party

to the suit, as owners of all the capital stock of the Bonham Publishing Company, a Delaware Corporation, entered into a contract with Paul F. Miller to sell all such stock to him. The body of the agreement reads as follows:

"This agreement made and entered into on this 10th day of November, 1954, by and between Clark Bass, Mary Jane McPheron and James D. Stinson, as parties of the first part, and Paul Miller as party of the second part.

"Witnesseth

"That whereas the parties of the first part are the owners of all of the capital stock of the business and corporation known as the Bonham Publishing Co., Inc., of Bonham, Texas. The said Clark Bass, owning 2,000 shares; Mary Jane McPheron 2,000 shares; and James D. Stinson 3,920 shares, and

"Whereas the parties of the first part are desirous of selling said stock, and

"Whereas the party of the second part is desirous of purchasing the same.

"Now, therefore, in consideration of the covenants and agreements to be hereinafter set forth and to be performed by the parties hereto as herein indicated, the parties to this agreement agree as follows:

"1. That the parties of the first part do by these presents sell and agree to convey to the party of the second part, or to a corporate entity to be formed by said second party, all of the capital stock of The Bonham Publishing Company, Inc., of Bonham, Texas.

"2. That the party of the second part agrees to pay to the parties of the first part for said capital stock herein above mentioned the total sum of $87,-500, payable as follows to wit: $5,000 cash in hand, the receipt of which is hereby acknowledged and deposited in escrow in the Durant National Bank of Durant, Oklahoma, to be held by said bank, subject to the terms hereof, and, $15,000 in addition thereto, payable upon the closing of this transaction, and the second party further agrees to deliver to the first parties or their order negotiable promissory note in the sum of $67,500 executed by the corporate entity to be formed by the second party and secured by first chattel mortgage upon the chattels of said new corporate entity, being the identical chattels now owned by the Bonham Publishing Company, Inc. and by pledge of the corporate stock of the new corporate entity to be so formed by said second party.

"3. The parties of the first part agree to sell, and the second party agrees to purchase local accounts receivable held by said Bonham Publishing Company, Inc., calculated at face value less 25 percent and less reserve now set up by Bonham Publishing Company, Inc., for bad debts.

"4. Second party further agrees to pay to first parties actual costs of newsprint on hand on date of transfer and prepaid insurance.

"5. First parties reserve from accounts receivable national accounts now held by said Bonham Publishing Co., Inc.

"6. It is further agreed that the closing date for this transaction shall be December 31, 1954, and second party shall take complete control and possession of said business and corporation on the first day of January, 1955.

"7. It is further mutually understood by and between the parties that the second party herein shall form a corporate entity either in the State of Oklahoma or the State of Texas, which said corporate entity shall take title to the stock certificates as transferred to second party by the first parties here-

in, and second party shall *de*solve the Delaware corporation under which said Bonham Publishing Company, Inc. now operates.

"8. It is further agreed that the first party shall convey said stock certificates to the second party free and clear of any and all liabilities of any nature whatsoever including ad valorem tax, income tax, social security, withholding tax, unemployment tax, or other tax items to which said corporation shall be subject.

"9. It is further agreed that an inventory shall be made of the assets of said corporation, the same to be made by an agent of the first parties and the second party with each party hereto retaining a copy thereof.

"10. * * *

* * * * *

"11. It is further agreed by and between the said James D. Stinson and the second party, Paul F. Miller, that the said James D. Stinson shall remain with said second party for a period of two weeks immediately following the first day of January, 1955, for the purpose of acquainting second party with said operations and also acquainting his manager with said operations and to introduce said second party and his manager to regular advertisers and clients of said Bonham Publishing Company, Inc.

"12. It is further agreed that the first parties shall complete the records of the Bonham Publishing Company, Inc. including the sale of said capital stock to date of closing this transaction, and deliver the same to second party in good condition.

"13. The parties of the first part further agree to execute a lease to the second party or to second party's corporate entity as second party shall desire of the business building now occupied by the Bonham Publishing Company, Inc., the exact description of which being unknown to the parties hereto at this time, said lease shall run for a period of 5 years with option of renewal for a like period and shall contain a monthly rental of $125 per month beginning with the first day of January, 1955, and like sum on the first day of each month thereafter during the term thereof, the second party further agrees to pay ad valorem taxes upon the entire building within which said Bonham Publishing Company is located, together with that of the Chamber of Commerce and the law firm of Cunningham, Cole and Southerland, and second party shall maintain the interior of that portion of said building occupied by second party, and the first parties agree to maintain the roof of said building and to keep said building insured for common hazards, and that said lease shall be executed at the closing of this transaction.

"13. It is further agreed that any future sale of said property now owned by the said Bonham Publishing Company, Inc. shall be subject to the consent of the first parties herein.

"14. Second party further agrees to continue existing contracts now in force and effect with the Bonham Publishing Company, Inc., as to news features, comics, news service and ad services; and first parties declare and warrant that there are no existing employment contracts in writing.

"15. Second party agrees that the balance due on said obligation, to be secured by said note and mortgage and pledge of stock, may be broken down into several obligations totaling said sum with said entire obligation payable over a period of 12 years bearing 5 percent interest on deferred balance with privilege of prepayment, of which said obligation may at second parties option be payable in 144 equal monthly installments; which shall include both

principal and interest, or may be payable in 144 equal principal installments with interest to be added to each payment.

"16. It is further mutually understood between the parties that the purchase of prepaid insurance as hereinabove set forth shall refer to only the chattels owned by said Bonham Publishing Company, Inc.

"17. It is further agreed between the parties that the first parties herein shall refrain from entering a like business directly or indirectly within the limits of Fannin County, Texas, for a period of 12 years from the date of the closing of this transaction.

"18. First parties further warrant to second party that the said Bonham Publishing Company, Inc. is now involved in no litigation of any nature whatsoever, and that there are no pending and disputed claims against said company."

The sale, transfer and delivery of the corporate shares and the assets of the Publishing Company, in so far as it is necessary to be noticed here, was consummated in this way: A corporate entity was formed under Texas law, with the corporate name, "The Bonham Publishing Company, Inc." For clarity, this Corporation will hereafter be referred to as the Texas Corporation, and its predecessor in the publishing business as the Delaware Corporation. The stock of the Delaware Corporation was transferred to the Texas Corporation. Then the Texas Corporation through its corporate agents voted the Delaware Corporation shares and elected directors and officials of the Delaware Corporation to replace the defendants below. Such defendants ceased to be officers, directors or stockholders in the Delaware Corporation, unless it be held that the provisions of the sales contract under equitable principles continues them in such capacity. After the Delaware Corporation's new directors and officers took charge, they immediately initiated action resulting in its dissolution. On January 1, 1955, the Texas Corporation, so far as the record shows, in compliance with the sales contract and without assignment or transfer to it of assets of the Delaware Corporation, except as to the extent the contract set out above may have done so, began and carried on the publishing business of the Delaware Corporation.

The defendants below directed special exceptions to the original petition of the plaintiff below. These special exceptions were overruled by the trial court. As appellees in this proceedings, the defendants below present cross-points in this regard. Appellant, the plaintiff below, seeks reversal and presents for review four points of error complaining of the action of the trial court. The first three points of error are briefed and argued as a group.

■ A statement of the rules governing this Court in this appeal seems proper at this point. Appellants did not request findings of fact or conclusions of law by the trial judge and none were filed. Under this record, the judgment of the trial court must be sustained if it is correct upon any theory of the case, Hunnicutt v. Lee, Tex.Com. App., 38 S.W.2d 572; Old National Life Ins. Co. v. Guest, Tex.Civ.App., 163 S.W.2d 241, wr. ref., w. o. m., and this Court is required to review the evidence in the light most favorable to the judgment of the trial court; Kimbell Milling Co. v. Greene, 141 Tex. 84, 170 S.W.2d 191; LaForce v. Bracken, Tex.Civ.App., 163 S.W.2d 239, affirmed 141 Tex. 18, 169 S.W.2d 465; and presume that the trial court resolved every issuable fact in such way as to support its judgment. Brownsville Shrimp Co. v. Miller, Tex.Civ.App., 207 S.W.2d 911; International Union of Operating Engineers, Local No. 564 v. Cox, 148 Tex. 42, 219 S.W.2d 787; Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114.

It is conceded, even alleged by the appellant, that all the shares of the stock of the Delaware Corporation had been transferred to and vested in the Texas Corporation on

January 1, 1955, preceding its dissolution on January 12, 1955. The record shows also that on January 1, 1955, preceding dissolution on the 12th, Bass, McPheron and Stinson were supplanted as officials of the Delaware Corporation by Paul F. Miller as President and F. A. Petrik as Secretary, and the two were elected Directors. Therefore it is established that the appellees Bass and McPheron were not President, Directors or Managers of the affairs or stockholders of the Delaware Corporation at the time of dissolution.

Within the letter of Articles 1388 and 1392, Miller and Petrik occupy the positions and are in the capacities the statutes name. However, it is the appellant's theory that ownership of the stock and management and control of corporate affairs did not pass to the Texas Corporation and Miller and Petrik, because the provisions of the aforementioned sales contract made it a legal fraud as to appellant by retaining the stock ownership and managerial authority in Bass, McPheron and Stinson. To establish this theory, the appellant must rely upon an interpretation of the stock sale agreement. Analysis of the contract is necessary to determine whether it supports appellant's position.

■ The paramount purpose of the contract is for the sale of all the shares of the Delaware Corporation stock to Miller, or the corporate entity he was to form and the payment of the purchase price to Bass, McPheron and Stinson. The provisions of the contract otherwise are to facilitate consummation of this main purpose, and to that extent are ancillary and incidental to the main purpose. This is not to say that such ancillary covenants and agreements are not enforceable as integral and vital parts of the contract, but is noticed because these provisions, in so far as their language will reasonably permit, will be construed to effectuate the main purpose and not prevent it. Such construction is authorized under well-established authority. See 17 C.J.S. Contracts § 309, p. 726.

Paragraphs 1, 2 and 7 make reference to the formation of a new corporate entity and dissolution of the Delaware Corporation, and by use of the word "shall" indicate that compliance is essential to performance of the contract. This gives substance to appellant's contention that at the time the appellees made the contract in their capacity as stockholders they required the transfer of assets and dissolution of the Delaware Corporation, and were therefore in equity stockholders in possession of corporate assets at the time of dissolution. In effect in this view they rendered impossible the corporate functioning of the Delaware Corporation and left it a hollow shell to be collapsed devoid of assets to satisfy its creditors. But the absence of other facts showing actual exercise of ownership powers over the stock after the date of transfer weakens a conclusion that these provisions alone are sufficient to give appellees de facto status as stockholders at dissolution. In this connection it is noticed that appellant neither pleaded nor proved that the Texas Corporation, Miller and Petrik, or either of them, was bankrupt, beyond the reach of judicial process, or unable to respond in their corporate capacities at any time after the stock vested in the Texas Corporation and Miller and Petrik assumed their positions as Directors and Managers of the corporate affairs prior to dissolution. The substitution of the Texas Corporation and Miller and Petrik for appellees prior to dissolution was perfectly legal and nothing is revealed by the record that such substitution is a fraud upon the rights of the corporate creditors, or in anywise prevents the subjection of corporate assets to the payment of corporate debts.

Further, in this connection there are other provisions of the contract which indicate that no fraudulent intent motivated the transaction or that it was an effort to evade creditors. By paragraph 8, Bass, McPheron and Stinson covenanted to convey the stock certificates free and clear of all liabilities. Then, looking again at the record as a whole, it is absolutely devoid of any evi-

dence that Bass, McPheron and Stinson knew of or had any notice whatever at the time they entered the contract of the indebtedness or claim upon which appellant later secured its default judgment. The record presented to this Court does not show the basis of the default judgment, whether it arose out of contract or tort, nor date of its inception. From the record, it could as well have come into being after January 1, 1955, a time after Bass, McPheron and Stinson transferred the stock as well as before.

In paragraph 9 of appellant's petition it is asserted: "The Delaware Corporation was not a bankrupt corporation in any sense of the word and there are no other known debts and creditors of the said Delaware Corporation other than the plaintiffs herein," which allegation is in accord with the facts proved. If the dissolution of the Delaware Corporation was a scheme to avoid the payment of corporate creditors, it necessarily was a scheme to avoid the payment of the particular debt upon which the default judgment is founded. As shown, above, lack of proof of the date upon which the claim arose and lack of proof that Bass, McPheron and Stinson had notice of the claim, renders it impossible to conclude that the contract was a simulated transaction and a part of a scheme to avoid payment of corporate creditors.

Some of the reasoning, facts and conclusions related above are pertinent and applicable to the other provisions of the contract which are discussed in the remainder of the opinion and vice versa, so in the interest of brevity and to avoid repetition, the same reasons, facts and conclusions will not be restated.

Paragraphs 2 and 15 with reference to mortgage, paragraphs 3 and 5 dealing with accounts receivable, paragraph 4 concerning newsprint, paragraph 13 restricting sale of corporate assets, and paragraph 14 requiring continuance of certain publishing services, all deal with the disposition or control of corporate assets and management of internal affairs of the Corporation and to that extent lend color to appellant's theory that Bass, McPheron and Stinson did not surrender but in fact continued to exercise the powers of the offices of President and Directors or Managers of the affairs of the Corporation at the time of its dissolution. However, this coloration disappears in the light of paragraph 6. This paragraph fixed the closing date for the sale of the stock as December 31, 1954, and provides that Miller shall take complete control and possession of the business and the Corporation on January 1, 1955.

■ Following the rule of construction previously mentioned that conflicting or repugnant provisions of a contract will be construed if possible to harmonize with the main purpose of the contract to the end that all of the provisions will have meaning and effect, the last-mentioned provisions of the sales contract are considered. The mortgage provisions of paragraphs 2 and 15 are not inconsistent with surrender of control and management since a chattel mortgage does not give a mortgagee any right of possession or control. See Chattel Mortgages, 92 Tex.Jur., p. 162, Sec. 66, and cases there referenced. Compliance with paragraphs 3, 4 and 5 was intended to be accomplished and discharged on transfer of the stock December 31, 1954, and these paragraphs do not import any continuing control of management of corporate affairs. Paragraph 13 may be construed as a provision in aid of the mortgagee's rights to preserve the corpus of his security and in any event, construed in connection with the contract as a whole, it does not evidence an intent to control assets of the corporation after the main purpose of the contract is accomplished. Paragraph 14 may be harmonized with the main purpose of the contract by construing it as being related to the mortgage and the provisions of paragraph 13, making more secure the deferred purchase payments. Cancellation of existing contracts could create liabilities against the assets and might endanger the

successful operation of the publishing business. A fair appraisal of the contract in connection with the whole record fails to show an intention to reserve or the reservation of power to Bass, McPheron and Stinson, giving them de facto management and control of the corporate affairs of the Delaware Corporation at the time of its dissolution, thereby constituting them statutory trustees of the corporate assets for the benefit of creditors under Article 1388.

■ The record does not reflect the basis upon which the trial court made its decision since no findings of fact were requested, but its judgment may be upheld for the reason that the evidence failed to fix liability upon the appellees under either Articles 1388 or 1390–1394, or by reason of a scheme to fraudulently avoid payment of corporate creditors.

A jury was empaneled in this case but only one issue was submitted, and after it was answered by the jury (it pertained to limitation) the court disregarded the answer and entered a judgment that the appellant take nothing. Some 26 days after the jury had made its finding, but before judgment was entered, the appellant asked leave to file a trial amendment. Permission was denied by the court.

■ Without extended discussion of the several grounds upon which the judge's ruling may be supported, it appears from the record that had the court permitted the filing of the amendment, the judgment nevertheless would have run against the appellant, and therefore no harm is disclosed.

■ Rule 66, Vernon's Ann.Tex. Rules, intends that amendment shall be freely allowed, but it does not excuse lack of diligence nor require on pain of reversal that abortive amendments be allowed or that disposition of a case be unduly prolonged or that the party opposing the motion be unnecessarily delayed and inconvenienced in the presentation of his case. Paragraph 8 of the sales contract upon which appellant relies for recovery under his amended pleadings, under a fair construction of the contract, was not inserted for the benefit of a third party such as appellant. It was intended for the protection of Miller and appellant has no justiciable interest in the contract. See 17 C.J.S. Contracts § 518, p. 1112. It may also be emphasized that leave to amend was not asked until 26 days after the jury had been discharged and no excuse was presented for such delay after trial. Too, the other parties to the sales contract besides the appellees certainly were proper parties to a suit to enforce the contract, and Stinson appears to be indispensable. The trial might have been interminably delayed by an effort to bring them into the lawsuit, this having especial significance after the jury was discharged.

The able presentation of the merits of this appeal by counsel for both appellant and appellees has rendered the work of the Court less arduous. For the reasons stated, however, the trial court's judgment is believed correct, and the cross-points of the appellees are not reached. Appellant's points are respectfully overruled, and the judgment of the trial court is affirmed.

On Motion for Rehearing.

Pending consideration of appellant's motion for rehearing, appellant has been permitted to supplement the transcript by bringing forward, among other things, the pleadings in appellant's suit against the Delaware Corporation. Consideration of the supplemental matter will not change the conclusion previously reached.

From the pleadings it is apparent that the appellant's claim against the Delaware Corporation grew out of a contract, and the original opinion is here modified to show that fact. The contract involved was entered into between the appellant and the Delaware Corporation and under its terms the appellant furnished the Delaware Corporation certain radio broadcasting material and services for a fixed monthly fee. The Delaware Corporation sold its

radio station and in connection therewith transferred and assigned the contract between it and appellant. Thereafter the new owner defaulted in the monthly payments. The appellant's pleadings in the suit against the Delaware Corporation are silent as to when after the assignee's default appellant first began asserting a claim against the Delaware Corporation. Neither the pleadings nor any of the other supplemental matter shows that the appellees in the present suit were aware that a claim against the Delaware Corporation was being asserted prior to the time suit was instituted against the Delaware Corporation. As noted in the original opinion, the contract between Clark Bass, Mary Jane McPheron and James D. Stinson is dated November 10, 1954. The suit against the Delaware Corporation was not filed until a date subsequent thereto.

The original opinion described the judgment the appellant obtained against the Delaware Corporation as being by default. Such description is inaccurate and though it is immaterial to the disposition of the case, the word "default" has been deleted from the original opinion.

Appellant's motion for rehearing is respectfully overruled.