S. M. DILL and Keaton McCrary Cotton Co., Inc., Appellants,

v.

Faneta GRAHAM, Individually and as Independent Executrix and Trustee of the Estate of Sawyer A. Graham, Appellee.

No. 8534.

Court of Civil Appeals of Texas, Amarillo.

Nov. 10, 1975.

Rehearing Denied Dec. 8, 1975.

McGowan, McGowan & Hale, Jim Pete Hale, Brownfield, for S. M. Dill.

Weaver & Ferguson, John T. Ferguson, Big Spring, for Keaton McCrary Cotton Co., Inc.

Anderson & Rudd, Ray D. Anderson, Brownfield, for appellee.

ROBINSON, Justice.

This is a suit for breach of contract and for conversion of the landlord's share of a cotton crop by the tenant farmer and a cotton buyer. The trial court entered judgment upon jury findings in favor of the plaintiff landlord against the tenant farmer and the intervening cotton buyer, and denied recovery on the cotton buyer's cross action against the tenant. The cotton buyer and tenant appeal from the judgment in favor of the landlord. The cotton buyer does not appeal from the portion of the judgment denying it recovery against the tenant. Affirmed.

The testimony is, in part, as follows: Plaintiff Faneta Graham, individually and as representative of her late husband's estate, owned a farm in Terry County, Texas, which was farmed for her by defendant S. M. Dill pursuant to an oral agreement. Mrs. Graham was to receive one-fourth of the cotton crop as rent. Dill first farmed the land in 1972. Although Mrs. Graham had permitted him to sell her share of the 1972 cotton crop with his share on the open market after harvest, Dill had never contracted cotton from Mrs. Graham's farm. On March 26, 1973, Dill, as seller, contracted through the Foster Gin, as agent for buyer, to sell all of seller's 1973 cotton crop grown on Mrs. Graham's farm to Keaton McCrary Cotton Co., Inc. The Foster Gin is owned by Keaton Acuff Company. The Mr. Keaton of Keaton Acuff is the same person as the Mr. Keaton of Keaton McCrary Cotton Co., Inc.

In October, 1973, Mrs. Graham first learned that Dill had contracted the 1973 cotton crop. In late December, after some of the cotton was ginned, she asked Dill to deliver to her the one-fourth of the "green cards," representing her share of the crop. Dill refused and said that he could not deliver the green cards and told Mrs. Graham emphatically that he was not going to deliver any of the tickets to her at any time. In fact, 41 bales of cotton (10¼ of which represented Mrs. Graham's share) had already been ginned and the green cards delivered to Keaton McCrary. At the time of Mrs. Graham's demand, and when she filed this suit, most of the crop was still in the field. The landlord's share of the cotton still in the field was 60 bales.

Keaton McCrary notified the gin that it was claiming the cotton. Adolph Hollman, Keaton McCrary's buyer, testified that the gin manager, who was acting as Keaton McCrary's agent, was instructed not to deliver the cotton. After the cotton in the field was ginned, and after suit was filed, the gin held the green cards on that cotton. Later, the gin delivered the green cards to

Dill for tender into court. Before trial, the court released three-fourths of the cotton to Keaton McCrary, and one-fourth (60 bales) to Mrs. Graham, in lieu of which Mrs. Graham posted her bond.

█ The jury found that Mrs. Graham and Dill had not agreed that Dill could contract the cotton for future delivery; that he agreed to deliver one-fourth of the cotton to her at the gin; and that he failed to do so. We find that Mrs. Graham's testimony supports these findings of the jury and, after considering all of the evidence, conclude that these findings are supported by sufficient evidence and are not against the great weight and preponderance of the evidence.

Appellants contend that, because a cotton crop belongs to the tenant until it is harvested, the tenant may contract to sell the entire crop even before it is in the ground, and that, as a matter of law, Keaton McCrary, having dealt with the tenant, could not have converted cotton belonging to Mrs. Graham. Appellee contends that the tenant may not contract to sell the landlord's one-fourth.

█ Unless their agreement provides otherwise, the tenant owns the entire crop prior to harvest. Nevertheless, the landlord has the fixed right to become owner of his share when the time for segregation and delivery arrives. *Millingar v. Foster,* 17 S.W.2d 768, 769 (Tex.Comm'n App.1929, jdgmt. adopted). To secure this right, he holds a landlord's lien. Tex.Rev.Civ.Stat. Ann. art. 5222 (1962) provides a preference lien on the crop regardless of actual notice or lack of notice to the purchaser. The statute is notice to all persons. See *Mathews v. Burke,* 32 Tex. 419 (1870). The landlord may enforce his lien either by following the cotton and foreclosing the lien, or by suing the purchaser for conversion. *Jarvis v. Spangler,* 251 S.W. 525 (Tex.Civ. App.—Texarkana 1923, no writ). The landlord waives his lien by authorizing the tenant to sell the crop. *Gilliam v. Smither,* 33 S.W. 984 (Tex.Civ.App.1896, no writ);

*Woodson v. Westbrook,* 272 S.W. 821 (Tex. Civ.App.—Austin 1925, writ dism'd). If a purchaser buys the crop or a part of it on which the landlord has a lien, without the landlord's consent or authorization to sell, the purchaser is liable in conversion to the landlord to the extent of the lesser of the value of the crop converted or the amount of rent due. *Zapp v. Johnson and Dick,* 87 Tex. 641, 30 S.W. 861 (1895); *Farmers' Elevator Co. v. Advance Thresher Co.,* 189 S.W. 1018 (Tex.Civ.App.—Dallas 1916, writ ref'd). Since one may convert personal property by receiving it pursuant to a transfer made without authority, it is thus incumbent upon the purchaser to ascertain the seller's authority to sell, if he would protect himself from potential liability. *Kimbell Milling Co. v. Greene,* 162 S.W.2d 991, 997 (Tex.Civ.App.—Fort Worth 1942), aff'd, 141 Tex. 84, 170 S.W.2d 191 (1943). The exercise of dominion or control over another's property in denial of or inconsistent with his rights is a conversion. *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444 (Tex. 1971); *Conlee Seed Company v. Brandvik,* 526 S.W.2d 795, 798 (Tex.Civ.App.—Amarillo 1975, no writ).

█ Applying the foregoing principles to the facts before us, we find that there is evidence that Keaton McCrary converted cotton belonging to Mrs. Graham.

█ We next consider whether there is sufficient evidence to support the jury findings that Keaton McCrary converted the 10¼ and 60 bales, respectively, on or about December 20, 1973. Mrs. Graham did not know the exact date in December on which she demanded the green cards. At one point in her testimony, she estimated it at December 20, 1973, and at another point, she said that it was between Christmas and New Year's Day. In evidence is an uncashed Keaton McCrary check for $1,370.78 tendered to Mrs. Graham after the suit was filed. The check, which was tendered as payment of the contract price for the 10¼ bales, is dated December 28, 1973, and recites that it is in payment of cotton that

day sold. The reasonable inference from the testimony, including that of Hollman and Dill, is that Keaton McCrary acted to exercise dominion and control over all of the landlord's share in the latter part of December, 1973. We conclude that the jury findings that Keaton McCrary converted the 10¼ bales and the 60 bales on or about December 20, 1973, are supported by the evidence and are not against the great weight and preponderance of the evidence.

 By issues conditioned on affirmative answers to the issues inquiring if Keaton McCrary converted cotton belonging to Mrs. Graham on or about December 20, 1973, the jury was asked to find the fair market value of the bales converted. The jury found that the fair market value of the 10¼ was $2,600.00 and that the fair market value of the 60 bales was $18,900.00. Hollman, Keaton McCrary's buyer, testified to all of the figures necessary to compute the value of the cotton at the time it would have been first available to Mrs. Graham. He testified that the $1,370.78 check (dated December 28, 1973) tendered to Mrs. Graham in payment for the 10¼ bales represented the contract price of the bales, computed by multiplying the contract price of 27.36¢ per pound times the number of pounds and deducting from the product $4.40 per bale for the first month's compress charges. The number of pounds in the 10¼ bales may be computed from those figures. Hollman testified that 52¢ was the lowest price per pound of the type of cotton involved from December 1, 1973, to January 20, 1974. It is apparent that the jury used these figures and the low per pound cost of 52¢ in arriving at the market value of $2,600.00 for the 10¼ bales converted.

The individual bales making up the 60 bales would have become available to Mrs. Graham as they were harvested and ginned, but not all on the same day. The price per pound of cotton fluctuated from day to day. Hollman had before him the warehouse receipts and the green cards on each of the 60 bales. Rather than have Hollman testify to the market price per pound of each bale, it was agreed that he might testify to the average price per pound of the bales at the time that they would have become available for sale. It was stipulated that his testimony in that respect would be correct. He testified that the average price as of the date the bales would have been available in the ordinary course of business was 59½¢ per pound. He testified, and it was stipulated, that the 60 bales totaled 31,963 pounds.

The jury obviously used the stipulated 59½¢ per pound average market price and the stipulated 31,963 pounds in finding that the fair market value of the 60 bales converted was $18,900. Since the damages did not accrue until the cotton would have been available, since the value at that time as testified to by Hollman was stipulated, and since the jury obviously interpreted the issue in the light of that testimony, we do not find that the trial court erred in failing to limit the conditionally submitted damage issues to a particular date nor do we find that the method of submission resulted in an improper verdict.

The jury found in answer to another issue that the amount of money which would reasonably compensate Mrs. Graham for Dill's failure to deliver one-fourth of the cotton crop was $21,500. The sum of $21,500 represents the $2,600 and $18,900 which the jury found to have been the market value of the 10¼ bales and the 60 bales, respectively, and which the uncontroverted evidence and stipulations show to be the market value at the time when it normally would have been available for delivery to her by Dill.

The answer to each of the damage issues is supported by evidence and is not against the great weight and preponderance of the evidence.

 Appellants contend that the trial court erred in failing to submit a series of issues on the theories of waiver and estoppel. The trial court submitted the theory of express waiver by asking the jury if Dill

was authorized by his agreement with Mrs. Graham to sell the 1973 cotton crop for future delivery. We do not consider the fact that Mrs. Graham had permitted Dill, one time in 1972, to sell her share of the crop after harvest to raise issues that Mrs. Graham had impliedly waived her landlord's lien on the 1973 crop so as to permit Dill to sell it on contract, or to raise issues that she was estopped to deny that Dill was authorized to contract the unplanted and ungrown crop for future delivery. The trial court did not err in refusing to submit the issues requested by appellants.

We do not find that the issues as submitted were a comment on the weight of the evidence or that, in the light of the stipulations and uncontroverted evidence, the wording of the issues submitted was calculated to cause or did cause an improper verdict.

The judgment of the trial court is affirmed.