VINSON PETIT, HEBER A. HARBISON AND MERLE
T. WAGGONER V. FRED C. KLINKE.

No. A-3664. Decided January 28, 1953.
Rehearing overruled March 4, 1953.
(254 S. W. 2d Series 769)

*Gibson, Ochsner, Harlan, Kinney & Morris* and *S. Tom Morris*, all of Amarillo, for Harbison and Waggoner, *Adkins, Folley, Adkins, McConnell & Hankins,* and *A. B. Hankins,* all of Amarillo, for petitioners.

The Court of Civil Appeals erred in holding that the evidence raised any issue for submission to the jury as petitioners and respondent. Exporters' and Traders' Compress & Warehouse Company v. Bargainer, 45 S.W. 563; Kimbell Milling Co. v. Greene, 141 Texas 84, 170 S.W. 2d 192; MacDonald v. Carlisle, 146 Texas 206, 206 S.W. 2d 224.

*Ernest R. Finney,* of Amarillo, for respondent.

In reply to petitioners point of error cited Dean v. Driggs, 137 N. Y. 274, 33 Am. St. Rep. 721; Merchants' Bank v. Gallagher, 8 S. W. 2d 683; Rothchild v. Moore, 37 S.W. 2d 121.

Mr. Justice Garwood delivered the opinion of the Court.

This is a bailment controversy over an alleged shortage in wheat stored with the respondent, Klinke—our petitioners, Petit, Harbison and Waggoner, who were bailors, complaining here of the action of the Amarillo Court of Civil Appeals in reversing a district court judgment in their favor against said respondent bailee, and remanding the cause for a new trial. See 248 S.W. 2d 545.

The suit was begun by the respondent bailee, with two additional bailors (Crammer and Stansbury) joined as co-plaintiffs, against the three petitioner bailors and one H. J. Hughes as defendants, the matter of the alleged shortage of about 2500 bushels total having arisen in connection with a sale to Hughes of a considerably larger amount from the respondent's grain elevator in Potter county. Respondent's suit, as begun, alleged in substance that his elevator was a private one for his own use, in which on June 25th, 1949, he had in storage 3165 bushels

of his own wheat, and that between the latter date and July 7, 1949, under arrangement with his two co-plaintiffs and the three petitioners, he received from these five, respectively, and stored in the elevator, specific amounts (bushels) of wheat, which, together with his own, aggregated some 19,204 bushels. There are also allegations that these amounts were all arrived at by weighing the wheat in question, as received, on the scales of respondent, which "had been duly tested, and proven to be correct." It was further alleged that in early March of the following year (1950), by authority of all concerned, respondent sold and delivered all of this wheat, including his own, to the defendant Hughes at an agreed price of $2.00 per bushel; that (apparently) the wheat was not all weighed again on respondent's scales, but was all weighed on the scales of Hughes, as delivered to him, the Hughes scales showing an aggregate weight of only 16,741 bushels, or some 2500 bushels (or about 14 per cent) less than the amount of 19,204 bushels abovementioned; that (in effect) the apparent shortage was due to the maladjustment of the Hughes scales, but that respondent had accepted without prejudice payment from Hughes for 16,741 bushels and tendered into court for the benefit of each petitioner a fraction of this payment corresponding to the fractional interest said to have been owned by each according to respondent's previous allegations. The prayer was for judgment against Hughes for the price of some 2500 bushels, apparently for the benefit of respondent and his five bailors, and that respondent be discharged from all liability to petitioners. The latter filed answers and also cross-actions against respondent as a bailee for hire, seeking recovery of the difference between (a) the values of their respective interests as stated in bushels by respondent in his abovementioned pleading and (b) their respective portions of the Hughes payment as tendered by respondent. They did not deny authorizing the sale but, on the contrary, expressly pleaded a right of recovery against Hughes, in the event his weights should be proved erroneous, though without asserting such event to be more than a possibility. Respondent in turn filed a general denial to the answers and a special plea to the cross-actions. The plea, in effect, stated (or restated in more positive fashion) that whatever information or record respondent had or had made or given of the wheat stored with him was merely the reflection of the 1949 weighing operation on his scales, the correctness of which he believed but never "guaranteed"; that he delivered in sale to Hughes all of the wheat (whatever number of bushels it might be) that was, on July 7, 1949, in his elevator; and that, if the Hughes weights should be correct, the

petitioners were entitled only to the sums tendered into court out of the Hughes payment.

At the close of the plaintiffs' evidence (hereinafter discussed) the petitioners filed their respective motions for an instructed verdict on their cross-actions against respondent, on each of which the court then and there noted that the same were well taken. Thereafter—apparently following the introduction of further evidence—the court submitted the single issue of whether "* * * the scales owned by H. J. Hughes * * * reflected the correct weight of the wheat delivered by the plaintiff Fred Klinke * * *." None of the parties appear to have objected to this issue (or to have later questioned the finding of the jury thereon) but respondent did request issues as to whether he "delivered to H. J. Hughes all of the wheat * * * deposited with him in 1949" by the named petitioners respectively, which the court refused to give. Following the verdict that the Hughes weights were correct, judgment was rendered for Hughes against all parties, plaintiff and defendant, and in favor of petitioners on their cross-actions against respondent, the decree reciting "findings" of the court to the effect that, as a matter of law, respondent had received the full number of bushels from each petitioner as claimed by the latter, and that petitioners were accordingly entitled to judgment against him as prayed for. Respondent, and he alone, appealed from this judgment—with the resultant reversal and remand on the ground that the trial court should have submitted additional fact issues in the controversy as between respondent and petitioners.

As to the evidence (which is before us only in an abbreviated statement for appellate purposes) respondent's pleaded version of the facts stands backed by his own testimony without contradiction or supplement, unless as hereinafter indicated. While not in the warehousing business, respondent was admittedly to receive substantial compensation for the storage. According to his testimony, there was nothing in the elevator on June 25, 1949, but that, beginning with the latter date and ending on July 7, 1949, wheat of himself and his five bailors, and none other, was deposited—the respective amounts of each depositor, including respondent, "being determined by the scales used by me and by tickets of each truck load as deposited", and such amounts, as so determined and as evidenced by the "tickets", being, in terms of bushels, the number of each petitioner now claimed by each, and the number for each of respondent and his co-plaintiffs, as well as the aggregate number (19,204)

of all six parties, as pleaded by respondent. Neither the character, content nor present whereabouts of the tickets further appears in the record, except to the extent that they were issued by respondent to the depositors and were, at least, a record of the weights. Respondent also testified that, following the above-described storage operation (evidently on July 7th, 1949) the elevator was locked and remained locked, and that none of its contents were "removed or in any way changed or altered", until, on March 6, 1950, such contents were all withdrawn and delivered in sale to the defendant Hughes. Respondent further testified that, being informed during the course of the delivery to Hughes, that the scales of the latter seemed to be weighing light, considering the capacity of the trucks being used, the last three truck loads were weighed on both scales, with results indicating in each instance about 14 per cent greater weight on the scales of respondent. Beyond this and respondent's testimony that his own scales had been officially tested and found correct on June 15, 1949, the only proof concerning the correctness of either of the scales is the testimony of Bender, an employee of Hughes, that the instant controversy was "the first time I heard any complaint" about the Hughes scales.

Apparently the theory of the trial court was that respondent, being by his pleadings and proof, irrevocably committed to having received from the petitioners the number of bushels claimed by them was liable to them to that extent, whatever might be his remedy against Hughes in the event the Hughes weights proved to be incorrect. However, upon further consideration after granting the writ of error, we agree with the Court of Civil Appeals that the basic premise of the trial court was unsound.

■ As to the pleadings, we do not consider respondent's claim that his own weights were correct and those of Hughes wrong to destroy necessarily his right, pleaded in response to the cross-actions, to be discharged even on the assumption that the Hughes weights were true. We believe the effect of these pleadings to have been no more than alternative pleading—a practice long permitted in this state, even when inconsistent positions are thus taken in different counts or defensive pleadings. See 2 McDonald, Texas Civil Practice (1950) §§ 5.08, 6.20, 7.01; 33 Texas Jur., "Pleading", §§ 10, 189; rules 48 and 84, Texas R. Civ. Proc.; Rotsky v. Kelsay Lumber Co., 118 Texas 180, 12 S.W. 2d 973; Traders & General Ins. Co. v. Wright, 144 S.W. 2d 626, Tex. Civ. App., error refused. The corollary, as

evidenced by the above decisions, obviously is that, as stated by a Texas law teacher of revered memory, "These inconsistent pleas cannot be used in evidence to disprove each other." Townes' Texas Pleading, 2nd Ed. (1913). The alternative count or plea of respondent in the instant case, that he had delivered all of the wheat to Hughes was, indeed, merely another way of saying that respondent's own scales were incorrect, but was yet not destroyed by the initial count alleging just the contrary. This is not less so because the initial count was primarily against Hughes and the other plea in response to the cross-actions of petitioners. The whole matter was a single transaction, and the effect of the pleadings the same as if, for example, the petitioners had begun the litigation as a suit against both respondent and Hughes and respondent's above described pleadings had been altogether defensive. In fact, petitioners themselves sought alternative relief against Hughes should it be determined that the Hughes weights were too light.

■ As to the evidence, it is enough to say that respondent's testimony committed him no further than that his own scales reflected the weights claimed by petitioners and that he had good reason to, and did, believe them to be correct and the Hughes weights to be incorrect. Considering that the correctness or incorrectness of a scale is something that may not readily be determined by the average man, without the assistance of experts, we do not regard such testimony as judicially binding him to the results of his own scales. His testimony that he delivered all the wheat in his elevator to Hughes did undoubtedly exclude every explanation of the alleged shortage except an error in the scales of Hughes or himself, but it is obviously within the realm of possibility that his own scales were wrong in 1949 and that he then stored only 16,741 bushels instead of 19,204 (with correspondingly less bushels for each co-owner of the mass than his scales indicated). Decisions such as Stanolind Oil & Gas Co. v. State, 136 Texas 5, 133 S.W. 2d. 767, 145 S.W. 2d 569. and Southern Surety Co. v. Inabnit, (Tex. Civ. App.) 1 S.W. 2d 412, 415, are not controlling. As indicated in both, a party is not necessarily bound to a fact which he admits only by way of opinion.

■ The issuance by respondent of the tickets does not, on the record before us, bring him within the terms of our Uniform Warehouse Receipts Act, Ch. 4, Title 93, Vernon's Tex. Civ. Stats. Ann, of which Article 5631 provides in part that "A warehouseman shall be liable to the holder of a receipt for damages caused by the nonexistence of the goods or by the failure of

the goods to correspond with the description thereof in the receipt at the time of its issue." Assuming, without knowing, that petitioners at time of trial were each a "holder", as defined in Art. 5664, the latter provides further that "receipt" means "a warehouse receipt", and there is certainly no suggestion in the record that the tickets come within the elaborate provisions of Art. 5613 and succeeding provisions, which indicate what is meant by a warehouse receipt. See Rodgers v. Murray, Texas Civ. App., 247 S.W. 888. Even a non-negotiable warehouse receipt is described, Art. 5615, as " a receipt in which it is *stated* that the goods received will be delivered to the depositor, or to any other specified person" (italics supplied). We, therefore, need not consider the matter of whether, as between the original parties thereto, a warehouse receipt may be impeached by the warehouseman for mistake.

■ Since respondent is not, therefore, precluded by his own pleadings and evidence, including the tickets, from relief based on the theory that he did not in fact receive the full number of bushels claimed by petitioners, he is entitled to a submission of that possibility if there is evidence to support it. The question is thus not whether, having actually received the full amount, he can account for it merely by saying he delivered it all to Hughes, but whether he received that much in the first place, or in other words, (a) whether his own scales were. in the June 25th - July 7th, 1949, period, wrong, despite his own belief to the contrary and (b) whether his scales, while weighing some 14 per cent too much, were yet uniform in their error, so as to determine correctly the respective fractional interests of all concerned in the mass of wheat, even should the mass turn out to be 16,741 bushels rather than 19,204.

■ The form of the requested issues was, indeed, improper in enquiring whether respondent delivered to Hughes the wheat that each named petitioner deposited with him in 1949. An affirmative answer, plus the answer that the Hughes weight of 16,741 bushels was correct, might still subject respondent to further liability beyond his money tender, unless it were determined also that each petitioner deposited with respondent less wheat than respondent's scales and each petitioner's ticket showed. However, since the trial court, prior to the appropriate time for requesting issues, had ruled that respondent was liable as a matter of law to petitioners for the amounts prayed by the latter, and respondent has complained of such ruling, we do not

think respondent waived or otherwise prejudiced his rights by his improper requests.

The verdict—which meant that respondent delivered only 16,741 bushels to Hughes—does not, of course, imply the existence of evidence showing respondent's scales to be incorrect or even those of Hughes to be correct. Respondent pitched his case primarily on the proposition that the Hughes scales were wrong, and having thus assumed the burden of proof that they were, the verdict may well have been due merely to his failure to carry that burden rather than to any positive evidence about either scale. But, in our opinion, the evidence of a 14 per cent difference in the two scales on the alleged truckload tests in 1950, plus the testimony of the witness, Bender, of an absence of any other complaint about the Hughes scales, plus respondent's testimony that he delievered all of the wheat to Hughes, are together some evidence that the scales of respondent were in 1949 incorrect, and that he then received only 16,741 bushels rather than the 19,204 bushels which his scales showed. The 1950 tests, showing the same percentage differences as to several different truck loads, were evidence that the error, if any, in respondent's scales was consistent or uniform, so that a jury might find that the 1949 weighing correctly determined the fractional interest of each petitioner in the mass, whatever the mass itself might truly weigh.

We, therefore, conclude that the trial court erred in holding respondent liable as a matter of law to petitioners. The contrary judgment of the Court of Civil Appeals remanding the cause for a new trial, is accordingly affirmed.

Opinion delivered January 28, 1953.

Associate Justice Culver not sitting.

MR. JUSTICE GRIFFIN, joined by Justice Brewster, dissenting.

In my opinion there is but one controlling question in this case and that question is: Was the action of the trial court in instructing a verdict for the depositors of wheat in respondent's elevator correct? To determine the correct answer to this involves certain other inquiries. The evidence is undisputed that respondent was charged 12 cents per bushel for storage of the grain belonging to the petitioners herein. In my opinion, this makes him a public warehouseman and subject to the provisions

of the laws governing public warehousemen. Article 5568, Revised Civil Statutes, 1925, provides:

"Any person, firm, company, or corporation who shall receive cotton, wheat, rye, oats, rice, or any kind of produce, wares, merchandise, or any personal property in store for hire, shall be deemed and taken to be public warehousemen * * *."

The Legislature could not have expressed more clearly their intention to make every person who stores wheat for hire a public warehouseman. The business of storing commodities of citizens of our state is a business affected with a great public interest. Longwell Transfer v. Elliott, Tex. Civ. App., 267 S.W. 346, writ refused; Exporters & Traders' Compress & Warehouse Co. v. Bargainer, Texas Com. App., 45 S.W. 2d 563. The Act of the 36th Legislature (1919) in amending the definition of a public warehouseman so as to make it read substantially as it does at the present time has the following emergency clause:

"In view of the importance of this Legislation to the State of Texas, and in view of the fact that the existing law regulating warehouses and warehousemen is confusing and is inadequate to meet the requirements of commerce and properly safeguard the handling of cotton and other products stored in warehouses, creates an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days be and the same is hereby suspended and that this Act take effect and be in force from and after January 1, 1920, and it is so enacted." Section 4, House Bill No. 63, Acts 36th Legislature, 2nd Called Session, Chapter 54, page 138.

I do not believe a person or corporation can exempt itself from the provisions of our warehouse laws merely by failing to give the bond or take the other steps required by the law. To hold a party could so exempt itself would be to make the law wholly ineffective and innocuous. In any event, respondent became a bailee for hire and as such he owes certain duties and obligations to his depositors. Exporters & Traders' Compress & Warehouse Co. v. Bargainer, supra; Kimbell Milling Co. v. Greene, Tex. Civ. App., 162 S.W. 2d 991; affirmed, 141 Texas 84, 170 S.W. 2d 191; 56 Am. Jur. 331, Section 21.

The evidence is undisputed that respondent had stored in this elevator 3,165 bushels and 40 pounds of wheat belonging to him and that all of the wheat stored was put into a common mass. When a warehouseman mingles his own goods (in this

case wheat) with like goods (wheat) belonging to other depositors, the warehouseman must suffer the loss as to any deficiency, and the other depositors shall be paid in full from said mass. 56 Am. Jur. 39, Section 168. The warehouseman may not dispose of any part of the mingled goods for his own benefit so as to leave an amount insufficient to satisfy outstanding receipts. 56 Am. Jur. 415, Section 206. It is just and right that the above rules of law be applicable to a case, as this one, when the warehouseman is to receive pay for storing the goods. He is paid for taking the risk of a shortage, and so long as there are goods to return to the depositors the amount the warehouseman has received, any loss should fall on the warehouseman. In this case the shortage was only 2,533 bushels of wheat, while respondent had in the common mass 3,165 bushels. When for any cause, *not occasioned by the fault of the depositors*, the amount of mingled goods on hand becomes less than that for which there are outstanding receipts, the warehouseman is required to account for the deficit. 56 Am. Jur. 397, Section 166.

The warehouseman must use ordinary care to preserve the property which is the subject of the bailment. When he cannot return the property, the bailor only has to show delivery of the property and that it was not returned on his demand. This makes a prima facie case of liability on the part of the bailee, or warehouseman, unless the goods were destroyed by fire, in which in stance bailor must prove the negligence of the bailee. In 5 Tex. Jur. 1039, Bailment, Section 29, the rule is stated as follows:

"When a bailor seeks to recover the value of property lost while in the hands of the bailee it is not incumbent upon him to allege or prove fraud or negligence; he need only allege and prove delivery to the bailee and the bailee's failure or refusal to return the property, or its return in an injured condition, for there is a presumption that loss or injury to bailed property was caused by the negligence of the bailee, and the absence of fraud and negligence on the part of the bailee is a matter of defense. After the bailor makes the necessary allegations the burden devolves upon the bailee to defend by showing that the property was not lost or injured by reason of his negligence.

" 'The reason of the rule is apparent. The bailee has the sole possession and custody of the chattel bailed. He cannot return the article to the bailor in a damaged condition or not return it at all, and by his silence defeat a recovery for the damage because of the bailor's inability to prove how the damage or loss happened.' "

The most recent pronouncement of this rule by this Court is the case of Trammell v. Whitlock, 150 Texas 500, 242 S.W. 2d 157, wherein we said:

"The defendant-petitioner is correct in his contention that the burden of proof on the whole case, including the issue of negligence, is on the respondent bailor, but as stated in Wigmore on Evidence 3rd Ed., Sec. 2508, 'Where goods have been committed to a bailee, and have either been lost or been returned in a damaged condition, and the bailee's liability depends upon his negligence, the fact of negligence may be presumed, placing on the bailee at least the duty of producing evidence of some other cause of loss or injury.' Without prejudice to the burden of proof being at all times on the bailor, the bailor under this latter rule makes a prima facie or presumptive case of negligence by proving the bailment and either the return of the goods by the bailee in a damaged condition, not existing at the time of their delivery to him, or a failure by him to return them at all. The rule is said to be based on the just and common sense view that the party in possession or control of an article is more likely to know and more properly charged with explaining the damage to it or disappearance of it than the bailor who entrusted it to his care * * *."

The above is particularly appropriate to the facts of our case, for all respondent says in his pleadings, or his testimony, amounts to no more than that he does not know how the shortage occurred, but that when he delivered the wheat to Hughes, he (respondent Klinke) was short some 2,500 bushels.

As the trial court gave an instructed verdict in favor of the depositors (petitioners herein) for the difference in value between the number of bushels of wheat their scale tickets showed they deposited with respondent, and the amount of money he had paid them, we must view the evidence in this case most favorable to respondent. Let us review the evidence to see if respondent offered any evidence to show he was not negligent with regard to the shortage in the wheat, keeping in mind that when the depositors proved they had scale tickets issued by respondent for the wheat claimed by them, and showed further that respondent had accounted to them for only a part of such wheat, they had made a prima facie case against respondent, and the burden of proceeding with evidence was on him. There was no dispute as to the fact that the depositors had the scale tickets issued by respondent for the total amount of wheat

claimed by each of them. Respondent so plead and so testified. He plead and testified that these tickets represented the weights as weighed on his own scale. He further pleaded that he was "the owner of a standard set of platform scales which scales had been duly tested and proven to be correct, and said weights of each and all of the above described parcels of wheat was *carefully weighed and the weights checked* and the total amount of *wheat placed in (the) elevator and contained therein,* according to said tested scales, aggregated a total of 19,204 bushels and 35 pounds." This total amount was the amount claimed by all depositors plus respondent's own wheat. He nowhere alleges that the scale on which the wheat was weighed in for storage in his elevator was incorrect; but, on the contrary, all his allegations are that the scale was correct, and Hughes' scale was incorrect.

Let us look at the stipulation as to "the facts material for the determination of the issues being appealed herein." Respondent testified: "I had in use at my elevator a Standard Howe scale and this scale had been tested by a licensed weight and scale tester on the 15th day of June, A. D. 1949, and certified as being in good shape, and I began the placing of wheat therein for the several parties herein as it was brought to this elevator in trucks beginning on the 25th day of June, A. D. 1949 and continuing from day to day until July 7, A. D. 1949 when the total amount was placed therein." He further testified that according to his scale tickets issued for wheat weighed on the above scale, each depositor had deposited in his elevator for storage the amount of wheat for which each depositor had sued. And further he testified that he weighed on his scale only the last three loads of the wheat hauled from his elevator and delivered to Hughes' elevator, and that there was a discrepancy in the weights of the two sets of scales. He used this discrepancy to figure the amount of wheat for which he paid each depositor. It is to be noted that respondent never did testify that his scale was *incorrect at any time*—either in June of 1949 when the wheat was weighed in for storage (and only 15 to 25 days after his scale had been declared accurate by a licensed weight and scale tester), or at the time the wheat was delivered to Hughes' elevator some nine months thereafter (March 5-8, 1950), or at the time of the trial on August 6-15, 1951. Nor is there any testimony from any source that respondent's scale was incorrect in June, 1949. I do not believe that testimony of a discrepancy in the scales of respondent and Hughes some nine months later, is sufficient to raise an issue as to the correctness or in-

correctness of respondent's scale at the time the wheat was weighed in for storage. Whether Hughes' scale was correct or incorrect was not an ultimate issue on respondent's liability to petitioners. The ultimate issue was whether or not respondent's scale was correct when depositors' wheat was weighed on the scale. The only evidence in the record shows that respondent's scale was correct at such time. This, in brief, was the state of the record facing the trial court at the close of the evidence. I do not believe it would have justified any verdict save for the depositors.

When respondent testified that his scale was found to be correct by a licensed weight inspector on June 15, 1949, I believe the law to be that the scale continues to be presumed correct until evidence is introduced to the contrary. There being no evidence to the contrary in this record, it was established, as a matter of law, that the scale tickets issued by respondent Klinke correctly reflected the amount of wheat he received for storage, and he is liable to each depositor for such amount. Wigmore on Evidence, 3rd Ed., Vol. 2, 413, Section 437; 20 Am. Jur. 205, Section 207; Commercial Credit Corporation v. Smith, 143 Texas 612, 187 S.W. 2d 363. I believe our quotation in Trammell v. Whitlock, supra, governs this case:

"As pointed out by Judge Learned Hand in the Alpine Forwarding Co. case (Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir. 60 F. 2d 734, 736), 'The presumption on which the bailor may rely is a mere rule for the conduct of the trial. It puts upon the bailee the risk of a directed verdict if he does not meet it, but it does no more; once he has done so, it disappears from the case. Thus, it can never concern the jury.' "

The respondent having failed to introduce any evidence to rebut this presumption of the correctness of his scale, it is my opinion that the trial court correctly instructed a verdict for the depositors. No depositor should be deprived of his goods except upon clear evidence. The warehouseman is paid for risk taking. If he does not want to take the risks incident to accepting products for storage, he need not carry on such business. To permit an elevator storage warehouseman to escape liability merely by proving he came out short at the end of his season, in my opinion, would destroy the protection which I believe the law places around a depositor. The depositor has no control over how his goods are protected or handled, and if a warehouseman accepts the goods for storage he should be accountable for them,

except for such defenses as the law of bailments has long recognized. Merely saying "I do not know what happened or how it happened that I am short" is not enough. In this case the warehouseman had sufficient wheat to account to each of his depositors. Under the facts of this case, if any loss is to be suffered the warehouseman, and not the depositor, should suffer such loss.

I would reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

Opinion delivered January 28, 1953.

Rehearing overruled March 4, 1953.