**MONTCLAIR CORPORATION, Appellant,**

**v.**

**EARL N. LIGHTFOOT PAVING CO., Inc., et al., Appellees.**

No. 14686.

Court of Civil Appeals of Texas.

Houston.

June 22, 1967.

Rehearing Denied Aug. 24, 1967.

Ben H. Schleider, Jr., Earl O. Latimer, II, Lake Alvin Greene, Jr., Houston, Dillingham & Schleider, Houston, of counsel, for appellant.

W. N. Arnold, Jr., Houston, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, of counsel, for Aetna Casualty & Surety Co.

Bennett Lay, Houston, Kucera, Lay & Lightfoot, Houston, of counsel, for Earl N. Lightfoot Paving Co., Inc.

BELL, Chief Justice.

## Majority Opinion

This is an appeal from a judgment rendered in favor of appellee, Earl N. Lightfoot Paving Co., Inc., against appellant for $16,536.50, with interest from the date of judgment, plus $6,500.00 as an attorney's fee, with interest thereon from the date of judgment. The purpose of the suit filed by appellee was to recover for work done and labor and material furnished under a written contract in the laying of pavement in a parking area at the Montclair Shopping Center in Houston and the construction of sidewalks and driveways in connection therewith. There were, of course, certain specifications that were a part of the contract in accordance with which the improvements were to be constructed. The contract also obligated appellee to maintain the surface for six months. Too, the suit encompassed an effort to recover for additional materials and labor furnished that were not called for in the contract.

Appellee asserted right of recovery on the theory of full performance of the contract and for the extras furnished. It, alternatively, asserted right of recovery on the theory of substantial performance, and, further in the alternative, on the theory of quantum meruit for all labor, material and services furnished both under the contract and those not covered by the contract.

Appellant defended on a basis of nonperformance in numerous specified particulars. On the theory that the improvements were not performed in conformity with the contract and that the improvements as constructed were wholly worthless and could not be corrected except by tearing up the pavement and other improvements, appellant filed a cross action against appellee

822

and its surety, Aetna Casualty & Surety Company, for $150,000.00. Judgment was against appellant on its cross-action.

The case was submitted on 35 special issues, many of which were unanswered because conditionally submitted. All theories noticed above were submitted.

The jury answered as follows on the issues relating to performance of the work called for by the contract, they relating to whether the work was performed in compliance with the contract or substantially performed:

1. Issue No. 1. Appellee did not perform *the work* in accordance with the contract of May 25, 1959, as amended.

2. Issue No. 3. Appellee substantially performed *the work* in accordance with said contract.

3. Issue No. 4. For substantially performing the *work* called for by said contract there was due appellee the sum of $71,693.51.

We specifically note that the amount found due for substantial performance of the work called for by the contract was the full amount for which appellant had been invoiced at the contract price. Without dispute appellant had paid $55,-614.42. Deducting the amount admittedly paid from the amount the jury found to be *due* under the contract for substantial performance of the *work* would leave a balance owing, assuming appellee in this case would be entitled to recover on the contract, of $16,079.09.

The jury in answer to issues submitting the theory of recovery on quantum meruit, including work, labor and material furnished under the written contract, and for extras not called for by the contract, found all issues of liability in favor of appellee, and found appellee was due and owing for the reasonable value to appellant of the materials and services furnished the sum of $16,536.50.

Appellee had sued for extras in the amount of $1,250.40.

An award of an attorney's fee of $6,-500.00 was also made.

The jury also found that appellant accepted the *work* after appellee *claimed* it was completed. It found that the architect accepted the *work* after appellee claimed it was completed. It also found that appellant waived the issuance by the architect of the *final certificate* of completion and acceptance of the work performed.

In response to Special Issue No. 16, the jury found that appellee *did not fail to install the paving in accordance with the contract*, and in response to Special Issue No. 18 it was found that appellee did not fail to install such paving in a good and workmanlike manner.

In response to Special Issue No. 20, it was found that appellee *did not fail to construct the driveways* in accordance with the contract.

The jury found that appellee failed to maintain the improvements for the period of time provided in the contract; that such was a material failure, *but that appellee was excused for such failure because of the failure of appellant to perform its obligations under the contract.*

Special Issue No. 31 was conditionally submitted. It was predicated on a "We do" answer to either Special Issue No. 16 or No. 20. The jury had, however, answered "We do not" to each issue, the effect of such answers being to find that appellee *had not failed* to install the *paving* and *driveways* in accordance with the contract. Special Issue No. 31 was, therefore, not answered, but it had inquired whether *any alterations* would have been required to make *"such improvements"* (paving and driveways) conform to the contract. Special Issue No. 32 was predicated on a "We do" answer to Special Issue No. 31 and inquired whether such *alterations would have been substantial.* It was unanswered. Special Issue No. 33 was predicated on a

"We do" answer to Special Issue No. 32, and inquired as to the value in the year 1959 to appellant of the improvements called for by the contract. It was unanswered. Special Issue No. 34 was also predicated on a "We do" answer to Special Issue No. 32, and inquired as to the value in 1959 to appellant of the improvements as actually constructed. It was unanswered. Special Issue No. 35 was predicated on a "We do" answer to Special Issue No. 31, and inquired as to the *reasonable cost of such alterations*, if any, required to make *such improvements* (paving and driveways) conform to the contract. It was unanswered.

We believe we have noticed all issues submitted, together with the jury's response to them, if any, that are material to this appeal. The jury did not fail to answer any unconditionally submitted issue.

The court rendered judgment for appellee, as above stated, for $16,536.50, which is the amount found by the jury as the unpaid sum of money due appellee for the reasonable value to appellant of materials and services furnished by appellee. This was, therefore, apparently a rendition of judgment on the theory of quantum meruit for the materials and services furnished under the written contract and for some extras sued for in the amount of $457.41. This conclusion is based on our notice that the effect of the jury's answer to Special Issue No. 4 was that there was a balance due for work done under the written contract of $16,079.09, the jury having found substantial performance. Additionally, judgment was rendered for an attorney's fee.

Appellant asserts the following five Points of Error, the substance of which we state:

1. The trial court erred in refusing to render judgment for appellant and in rendering judgment for appellee on the theory of quantum meruit because an express contract was pled and proved and appellee's theory of the case was that it had fully performed.

2. The trial court erroneously admitted hearsay evidence of appellee bearing on quantities and costs of materials and equipment rentals, using invoices prepared by third persons who did not testify.

3. There was no evidence, other than hearsay, to support the findings of the jury on quantum meruit and substantial performance.

4. There was no evidence to support the finding that appellee performed the *paving* in accordance with the contract, or, alternatively, such finding was against the overwhelming weight and preponderance of the evidence.

5. The jury findings, that there was an acceptance of the improvements by appellant and its architect and that there was a waiver of acceptance, are in hopeless conflict, or, alternatively, such findings are either not supported by the evidence or are contrary to the overwhelming weight thereof.

The record in this case consists of 792 pages of testimony, 37 exhibits introduced as Plaintiffs' (appellees'), and 58 exhibits introduced as Defendant's (appellant's). All exhibits are here in original form. Many of them are bulky and cumbersome. We will merely summarize the evidence we feel controlling and many of our statements will be our conclusions as to the material facts shown by the record. We have, however, carefully read the entire statement of facts and all of the exhibits.

Appellant sought bids for the laying of ping center bounded by Richmond Road on the South, Weslayan Street on the east, and Academy Street on the west. On the north it appears there would be some vacant land between the north side of the shopping center buildings and Law Street. There was a Weingarten grocery store already on the site. Apparently appellant

was the general contractor for the construction of the additional buildings and was owner of the building site, and would be the owner of the buildings on completion, subject to certain construction loans obtained to aid in financing.

Appellant sought bids for the laying of pavement, construction of driveways, including removal of curb and installation with roll curb according to City of Houston specifications. There was already some pavement used in connection with the Weingarten store. This was to be removed and new pavement laid. The work was to be done in compliance with certain plans, specifications and drawings prepared by Irving R. Klein and Associates, as architects. Appellee's bid was accepted and a contract was entered into between the parties on May 25, 1959. It was prepared on a printed form issued by the American Institute of Architects and is denominated "The Standard Form of Agreement between Contractor and Owner for Construction of Buildings." The appropriate blank spaces in the form were filled in showing the work to be done and the prices agreed to by appellee. Too, appellee's bid is attached and made a part of the contract. It should be noted, because of appellant's contention, that there are a few words in the printed form deleted and typewritten words substituted. In Article 4, which provides for monthly installment payments, it is provided that payment on the 15th day of each month of 85% of the value, based on contract price of labor and materials incorporated in the work, and materials suitably stored at the site up to the first of the month as estimated by the architect, less previous payments, shall be made, and upon "substantial" completion of the entire work, a sum sufficient to increase the total payments to 85% of the contract price shall be made. The printed word "substantial" appearing in the form is deleted and the word "final" appears typed in. In Article 5, dealing with the final payment and acceptance, it is provided in the printed form that final payment shall be due thirty days after "substantial completion of the work provided the work be then fully completed and the contract fully performed." The word "substantial" is deleted and the word "final" is typed in.

As a part of the contract there is what is denominated "Addendum Bulletin No. 1" dealing with the paving. It provides as follows:

The pavement shall consist of 600 pounds per square yard of cement stabilized shall, 1½ sack per ton compacted by use of roller weighing not less than 10 tons to 6 inches of depth and 150 pounds asphalt shell topping compacted to 1½" depth.

The owner or engineer shall compute the total tonnage of material required for the job and the contractor shall furnish truck delivery tickets for at least that amount of material.

While the owner pays for testing and coring of fill and paving materials, the contractor is to pay for any retesting in case any deficiency is shown.

In the form contract dealing with payment, it is provided that all quantities listed are approximate and the contractor will be paid for the actual amount of work performed at the unit prices bid. It further provided that "the work will be cored and payment reduced proportionately to any measurement below specified thickness."

The contract also provided that the payment for the cement base and asphalt surface should include preparation of the subbase in accordance with the plans and specifications. The subbase was to be compacted to a density of 95% of maximum density at optimum moisture content as determined by Proctor Compaction Tests.

With regard to the cement mix, it is provided that the contractor should use grade stakes, cubical block or other approved methods to fix thickness of processed shell as it is spread. For compaction the use of

a 10 ton roller was specified. Compaction of the cement stabilized shell base and the asphalt shell surface was to be a minimum density of 94.

The contract also provided that the contractor should maintain the surface for a period of six months.

The appellee's bid called for from 31,000 to 35,000 square yards of new pavement at $1.87 per square yard. The square yardage of the existing Weingarten pavement and its replacement is not specified, but it was to be paid for at the rate of $1.99 per square yard. The driveways with roll curb were to be paid for at the rate of $3.25 per square yard. The sidewalks were to be paid for at the rate of 35 cents per square foot.

We need not notice the two other small items of work, because they are not involved.

The evidence, as we read the record, is in conflict about whether the items of work called for were done in accordance with the contract, except the failure to maintain, which failure was found by the jury to have been excused by appellant. No attack is made on such finding. No issues were submitted concerning the minor items of a sidewalk and raising and changing existing manholes and inlets.

While appellant has assigned the points of error stated above, the basic complaint is that there is no evidence, except hearsay, to support the jury's findings on quantum meruit and substantial performance, and there is no evidence to support the jury finding that the paving was laid in accordance with the contract, or, alternatively, that such finding is contrary to the overwhelming weight and preponderance of the evidence. The primary basis of these assertions is that the evidence shows the cement stabilized shell was deficient in quantity because the contract called for 600 pounds per square yard rolled by use of a roller of at least ten tons to a depth of six inches, and that in fact there was a short-age in the material which resulted in an insufficiently compacted base and also one that did not measure six inches in thickness, and this made an unstable base. Further, it is asserted the contract called for a surface of hot mix asphaltic concrete of 150 pounds per square yard rolled with a roller of at least ten tons so the surface would measure 1½ inches in thickness and that there was a shortage in quantity which resulted in a surface of less than 1½ inches. Too, alleged failures in the pavement are attributed to an inadequately compacted subbase or subgrade. Lack of evenness and improper grading resulting in faulty drainage is urged.

Daniel F. Smith Laboratories was the testing agent for Montclair. Under the contract the subbase and the concrete stabilized shell base were to be inspected by appellant's agent and approved before the surface could be laid. Then finally the surface improvement was to be inspected and approved. The paving was done by sections. Mr. Lightfoot testified that the contract provisions were followed. As the subbase for a particular section was prepared, it would be inspected by appellant's agent and approved before the concrete stabilized shell base was laid. His testimony and the detailed report of appellant's agent, introduced as Plaintiff's Exhibit 19, clearly show that the subbase was in accord with the contract. The exhibit reflects that a copy of each of the inspection reports was sent to appellant, Irving R. Klein, architect, and to appellee.

The evidence with regard to whether the cement stabilized shell base was in accordance with the contract is conflicting. (We use the term "contract" to include plans and specifications.)

The evidence relating to quantity of both the cement stabilized shell and asphaltic shell concrete topping comes from the testimony of Mr. Lightfoot, testing laboratory reports and invoices from Mr. Lightfoot's business records. These invoices are those prepared by the suppliers and the material

shown on them was paid for by appellee. These invoices were placed in the record based on Mr. Lightfoot's testimony, even though objected to by appellant on the ground that they were prepared by someone else. However, Mr. Lightfoot testified they were a part of his business records kept under his supervision; that he personally knew all of the material went into the Montclair job; and that he paid the invoices. He also testified he had personal knowledge of all the facts reflected by the invoices and payrolls. The same is true with regard to the invoices covering charges for equipment rentals. Too, the payroll covering payment to persons serving on this job and other jobs was introduced, but the services rendered on this particular job were segregated by Mr. Lightfoot in his testimony.

As previously stated, Daniel F. Smith Laboratories was the appellant's agent to make inspections and tests. In the record are Appellant's Exhibits Nos. 1 through 6. These exhibits purport to show the tonnage of cement stabilized shell and hot mix asphaltic shell concrete laid on various dates together with the thickness of each. Too, the reports purport to show what tonnage of each would be required if the area covered would supply the cement stabilized shell base of 6 inches in depth and the hot mix asphaltic shell concrete topping of a thickness of 1½ inches in depth if the specified tonnage was compacted to the required density. When the tests were made does not appear, but all of the reports are dated prior to August 22, 1959, the latest date being shown on any of them being August 20.

The significance of these reports by appellant's representatives is that though they purport to show less than 600 pounds per square yard of cement stabilized shell base and 150 pounds per square yard of asphalt topping, and that there was a deficiency in depth in both the cement stabilized base and the asphalt surface, no complaint was made to appellee of any of these alleged deficiencies until the entire parking lot had been paved. It is to be noted that where deficiencies were discovered in the subbase they were called to appellee's attention and corrections were made. Too, it is of significance that copies of the reports were sent to appellant's architect and to appellant as well as to appellee. When they were received by the architect or Lightfoot we are not informed. Two of them are stamped "received" by appellant before August 22. Two were stamped "received" by appellant August 27, and two are stamped as received by appellant September 2. The particular significance of the reports that were dated before August 22 is that they were made by the chosen representative of appellant and, prior to August 22, appellee had, in accordance with the contract, sent appellant two estimates based on work then done in accordance with the contract and appellant had paid the amount of the estimates less the 15% retainage called for in the contract. Too, it is noted that the work was completed in sections and as completed opened for use by appellant and used by it and its tenants and customers. Though the two estimates covered work done up to August 1, the last payment was made August 22, though no complaint had been made to appellee of shortages or defects.

The last estimate was after all work called for by the contract had allegedly been completed and is dated September 1. It is appellee's Invoice No. 3371. It claims payment for 31,437 square yards of new paving @ $1.87 per square yard and for 5,768 square yards @ $1.99 per square yard. This latter item is for replacing pavement previously in place that was used by Weingarten. Too, it covered construction of 4,080 square feet of sidewalk. This invoice showed the total of the cost at the unit prices prescribed in the contract to be $71,693.51. It showed that two payments had been made, one on July 21 and one on August 22. The amounts were for 85% of the estimates made on July 1 and August 1 and totaled $37,614.42. This left a balance due of $34,079.09 according to the invoice.

On this invoice no additional 15% retainage is shown.

On September 24, appellant's architect issued to appellant what is referred to therein as "Certificate of Payment No. 2." It contains, among other things not necessary to notice, this language:

"We, along with Mr. Anderson, have examined Contractors Invoice No. 3371 dated September 1, 1959 (Duplicate copies of which are attached) and find it to be in order.

"Earl N. Lightfoot Paving Company, Inc.—is due payment in the amount of $28,967.23."

The amount thus certified to be due is the unpaid balance of $34,079.09 less 15% retainage.

On September 18 appellant paid $18,-000.00 on this invoice.

Based on the appellant's exhibits above discussed, there would be a shortage in the cement stabilized shell base and asphaltic topping. It is observed that while this work was in progress Mr. Anderson, who is referred to in the architect's approval of "Certificate of Payment No. 2," was in rather close supervision for appellant of the work as it was being performed and we fail to find any complaint he made about the work. According to appellant, the material shortage would be about 10%.

Mr. Lightfoot testified that the invoices which he paid for materials furnished under the contract did show about the same percentage of shortage as above stated, but he was never satisfied that he had found all of the invoices. However, after appellee claimed all work under the contract had been properly done and he had not been paid and appellant was insisting there were shortages and defects, appellee employed Engineers Testing Laboratory, Inc., to take sample cores for the purpose of determining thickness of the shell base and asphalt topping and to determine the weight per square yard of the material. This report on thickness is dated November 2, 1959, and shows the shell base and the asphalt topping to be of the required thickness. The report on the weight of the material is dated November 4, 1959, and shows the weight of the material per square yard to be that required. Appellant criticizes this report as not being a representation of the whole area. The weight to be attached to it was for the jury.

Mr. Lightfoot also testified that after the subbase was approved he set the block and stakes as provided in the contract to determine the thickness of the cement stabilized shell base and rolled it with the 10 ton roller required, and thus also saw to it that there was the required 6 inch thickness. Then as this base was finished on a particular section he laid the asphalt topping. At no time before he laid the topping did appellant's inspectors complain of the base; nor did they complain of the topping until all the work was completed.

After appellee claimed all work on the parking lot had been completed and while use was being made of it by appellant, appellant ordered extra work of appellee. Appellee performed such extras, though there is a dispute as to the extent of these extras.

The latter part of 1963, appellant employed Mr. Turner, a consulting engineer, to make a topographical survey of the parking area. His survey is dated in January, 1964. This was over four years after the paving was done. Particular complaint by appellant was of the paving of the Academy Street side and of unevenness throughout the paved areas. Mr. Turner's survey showed unevenness particularly on the Academy Street side. There were low places. The effect of his testimony would be to show uneven distribution of building materials causing unevenness, and also he testified the construction was not on proper grade. He felt though his work was done the last of 1963 it would reflect within ½ an inch, one way or the other, the conditions that existed in 1959. He testi-

fied to what he termed some base failures on the Academy Street side. He felt the only way to fix the Academy Street side would be to tear it out and do it over completely. The cost would be $80,000.00. He felt that the base failures could have been caused by failure to compact the subbase and base to required density. This would permit moisture to penetrate the paving.

In 1965, shortly before trial, Mr. Jeanes of Southwest Testing Laboratory, was employed to make tests of the paving to determine thickness of the shell base and asphalt topping and to calculate the weight of the materials per square yard. The result of his tests, made by taking cores from various parts of the pavement, appears as appellant's Exhibits 28 and 29. The testimony of Mr. Jeanes and his reports have the effect of showing deficiency in quantity of materials used and maldistribution so as to cause substantial variation in thickness of the shell base and asphalt resulting in substantially inferior pavement.

Mr. McKnight, a consulting engineer, on behalf of appellee, examined the pavement about ten days before trial. In his opinion it was in good condition, particularly considering its use for five years. He found no base failures that could not be remedied by comparatively insignificant repairs. This was on the Academy Street side. He saw some patches on the Academy Street side. The reason, in his opinion, for the condition of the Academy Street side and the Weslayan Street side was the difference in use to which put. The pavement of this nature is designed for lightweight vehicles and frequent use instead of heavy vehicles and infrequent use. At the time he was there, there were about three vehicles on the Academy Street side and 300 on the Weslayan Street side. An asphalt surface is kept alive by regular use by light vehicles. Heavy trucks use the Academy Street side. It is the back side where trucks unload. This is damaging to asphalt.

The witness felt that the condition of the Academy Street side was due in part to the fact that water coming from spouts draining the buildings emptied onto the asphalt.

The witness stated that the area was formerly used to cultivate rice and contained silt and light clay. This would be conducive to allowing excess moisture. Where there is excess moisture, there is great expansion, and when there is a drying out there is rapid shrinkage. There can be both vertical and horizontal seepage. Too, elevation changes come from natural heavage of the soil. He states, assuming $2,000.00 in repairs over a five year period, this would be on the low side. After five years' use, the asphalt would not be as thick because of evaporation when it was hot and because car tires pick up materials.

Mr. Nix, owner of appellant, among other things, testified that up to October 11, 1963, his invoices showed cost of repairs to be $1,025.00. We are unable to tell from the record whether they were made during the six months' period that appellee was to keep the pavement in repair. We will assume they were because the jury found there was a failure to maintain the improvements as provided by the contract; but that such failure was excused by the failure of appellant to perform. We notice there is no attack here upon such jury finding. However, such a small expenditure would be evidentiary of well constructed pavement. Mr. Nix testified that as the various sections were finished they were opened for use. Some of his rental contracts with tenants who would occupy the stores when completed provided for the furnishing of a parking area. We refer particularly to the W. T. Grant lease. Also, the lease provided for appellant to furnish the architect's certificate that all improvements have been completed in accordance with plans and specifications. Too, the loan commitment required such a certificate. While the architect did not issue a formal certificate to appellant

that appellee's work had been completed in accordance with the plans and specifications, he did by appellee's Exhibit 20 approve appellee's Invoice No. 3371 dated September 1, as previously discussed. While the architect referred to the invoice as Estimate No. 2, there was nothing on the invoice to indicate it was such. While not labeled a final invoice, it was such in fact and there had already been two estimates, one of July 1 and one of August 1. Shortly following the claim in August that the work was complete, the tenants moved in and have been using their respective stores, and they and their customers have been using the parking facilities constructed by appellee.

There was testimony that the improvements were so deficient the only way to make them comply with the contract was to tear them out and replace them, and the reasonable cost of doing this would be about $150,000.00 as contended by appellant in its cross-action. This testimony, as we recall, was from appellant's witness, Mr. Turner. There was testimony from Mr. Lightfoot that the reasonable value to appellant of the materials and services furnished by appellee under the contract and for extras was the amount for which appellant was billed.

■ Points Two and Three are closely related and will be discussed together. The court did not err in admitting in evidence the invoices for materials furnished, equipment rentals or the payrolls. While it is true that the invoices were those prepared by the suppliers, they were sent to appellee for payment and were paid by appellee. Mr. Lightfoot testified they were kept as a part of his business records under his supervision. Too, he testified that he had personal knowledge that all the materials, rentals and services went into the job and they were of the reasonable value shown as incorporated in the improvements. The same is true with respect to the invoices covering materials, equipment rentals and services covering extras. Too, the origi-

nals of the payrolls were introduced and Mr. Lightfoot based on his knowledge segregated the work of the men listed going into the job. Lightfoot's testimony that he had firsthand knowledge of the facts stated in the invoices would make them admissible as substantive evidence. Kansas City, M. & O. Ry. Co. of Texas v. Worsham, 149 S.W. 755 (Tex.Civ.App.), n.w.h.; 1 McCormick and Ray, Texas Law of Evidence, page 578. Too, we think that the fact Lightfoot paid for the materials and services represented by the invoices is some evidence of their correctness, particularly when coupled with his testimony as to his personal knowledge.

■ The jury finding of substantial performance and the findings on substantial performance are sufficiently supported by evidence not hearsay in nature.

■ Appellant's first point, on which it lays much stress, is that the court erred in refusing to render judgment for appellant and in rendering judgment on quantum meruit because an express contract was pled and proved and appellee's theory was that it was fully performed.

Appellant misconceives the law in this regard. Had appellee only pled an express contract and had by evidence stood solely on a right to recover on the contract, appellee would be allowed recovery only if it fully performed. However, in this case appellee, as it is permitted to do under Rule 48, Texas Rules of Civil Procedure, pled alternatively for recovery on the theory that it had fully performed the contract, or, if it had not that it had substantially performed, or, if it had not substantially performed it was still entitled to recover the reasonable value of the benefits conferred upon and knowingly and willingly accepted by appellant. Too, it pled to recover, in addition, for extras furnished at the special instance and request of appellant. Where, as here, several theories of recovery are pled, and the evidence is conflicting but is sufficient to raise a question of the existence of any or all of the theo-

ries, it is proper to submit issues to the jury on all theories raised. The court will then get a verdict and render judgment on the proper theory as found by the jury. Hodges on Special Issue Submission in Texas, page 3; Colbert v. Dallas Joint Stock Land Bank, 129 Tex. 235, 102 S. W.2d 1031 (Com.App.); Petit v. Klinke, 152 Tex. 142, 254 S.W.2d 769; Montgomery v. Gay, 222 S.W.2d 922 (Tex. Civ.App.), error dism.; Johnson Aircrafts, Inc. v. Eichholtz, 194 S.W.2d 815 (Tex. Civ.App.), ref., n.r.e.

■ In its discussion under Point One, appellant cites cases which make the broad statement that if there is an express contract there can be no recovery on quantum meruit because quantum meruit is independent of the contract. However, in such cases there was no situation such as we have here where there was alternative pleading and conflicting evidence concerning whether the contract was fully performed. We will not lengthen this opinion by specifically noticing each case, but it will suffice to say none of them is applicable to the situation we have before us. It has long and many times been held in this State that though there be an express contract there may be a recovery in quantum meruit if there has been partial performance as distinguished from full performance. Carroll v. Welch, 26 Tex. 147; Campbell v. Hildebrandt, 68 Tex. 22, 3 S.W. 243; Colbert v. Dallas Joint Stock Land Bank, supra, and many authorities there cited.

Probably the point is not sufficient to encompass part of the argument under it, that is, that the jury having found substantial performance the court could not render judgment on quantum meruit, but the right to recover on quantum meruit is restricted to a situation where there is only partial performance. We will nevertheless consider it, and overrule the contention.

No case has been cited us, and in our extensive research we have found none, which holds that if there has been only substantial performance the contractor is restricted to recovery on the contract, recovering the contract price, including profits, if any, less the reasonable cost of completing the building in accordance with the contract. The cases do allow recovery on the contract for substantial performance; but we think the contractor may elect to sue on quantum meruit for the reasonable value of the benefits conferred on the owner, the value not to exceed the contract price, and the owner may recover his damages against the contractor for not fully performing. If there has been no substantial performance, the contractor is limited to recovery on quantum meruit. Whether we be correct in this or not, we feel that under the facts of this case it really makes no difference.

■ In this case it is evident, when we consider the verdict as a whole, as we must, that the jury felt and so found that the only breach by appellee was its failure to maintain the improvements for six months. The jury found this was excused by the owner in not performing and there is no attack on this finding. The effect of the jury's finding to Special Issue No. 4 was that for the paving and driveways there was due at the contract price a total of $71,693.51. The wording of the issue did not call to answer for the balance owing. Deducting the admitted payment of $55,614.42 would leave a balance of $16,079.09. The court could have rendered judgment for this amount, plus any extras furnished. However, the issue on the amount owed under the theory of quantum meruit was submitted so as to include not only the extras but the value of the materials, etc. furnished under the contract that had been only substantially performed. Appellee had sued for, and introduced evidence to show, $1,250.00 extras. To the issue the jury answered "$16,536.60". The effect, when considered in connection with the answer to special issue No. 4, is to find the amount owed for the materials, etc. furnished under the contract was $16,079.09 and the value of the extras was

$457.71. Certainly the contract price is evidentiary of the reasonable value of what is furnished. In any event, no more was recovered than the evidence showed was the reasonable value of the improvements to appellant. The court here rendered judgment on quantum meruit, but it could have, under the verdict, rendered judgment in part on Special Issue No. 4 and added the $457.71 representing extras included in the issue on quantum meruit. The result is the same, so appellant could show no harm. Montgomery v. Gay, 222 S.W.2d 922 (Tex.Civ.App.), error dism.; Johnson Aircrafts, Inc. v. Eichholtz, 194 S.W.2d 815 (Tex.Civ.App.), ref., n.r.e. The court rendered judgment, however, apparently on quantum meruit.

By its fifth point of error, appellant urges a conflict between the jury answer that appellant and its architect accepted the improvements, and its answer that there was a waiver of acceptance.

There is no conflict. Issue No. 11 inquired if appellant accepted the work after appellee claimed it was complete. Issue No. 12 made the same inquiry about acceptance by the architect. The jury answered, "We do", to both issues. Issue No. 13 inquired if appellant waived the issuance by the architect of a *final certificate*. The first two dealt with acceptance by the parties of the improvements by conduct such as continuous use. Too, some lease contracts of tenants provided they would not be required to take possession until the architect had issued a certificate that all work, including parking facilities, had been completed according to contract.

This referred to the requirement of a formal final certificate. We find no evidence that a final formal certificate was ever issued. However, we have stated the facts about use by both appellant and the tenants. From the facts it can be inferred that the work was accepted though no formal final certificate was ever required. In fact, the acceptance under the facts shown

here would evidence the waiver of a certificate.

Even if there were a conflict it would not be fatal because there is no need for a certificate where recovery is for substantial performance or on quantum meruit. Childress v. Smith, 90 Tex. 610, 40 S.W. 389; Linch v. Paris Lumber & Grain Elevator Co., 80 Tex. 23, 15 S.W. 208.

From an analysis of the evidence, we find the jury's answers supported by evidence and no answer is contrary to the overwhelming weight and preponderance of the evidence.

Affirmed.

## Dissenting Opinion

COLEMAN, Justice.

I agree with the opinion of Chief Justice Bell with the exceptions herein noted.

Here issues were submitted on theories of full performance, substantial performance, and quantum meruit. The jury found substantial performance and that full performance was prevented by conduct of the owner, and further answered issues on which the court entered a judgment based on quantum meruit.

In Teague v. Edwards, 159 Tex. 94, 315 S.W.2d 950 (1958), the Supreme Court held that if there be a valid express contract, a recovery cannot be sustained in quantum meruit.

In Dallas Electric Supply Co. v. Branum (Tex.Civ.App.—Galveston 1954, ref., n. r. e.), the opinion reflects that by one special issue the jury found an express contract to pay a certain amount of money as attorney's fees. By its answer to another special issue the jury found that a reasonable attorney's fee for the services rendered was a greater sum. The trial court entered a judgment for the larger amount. The Court of Civil Appeals stated that a party cannot recover in quantum meruit

832

where he has an express contract and required a remittitur as a condition of affirmance.

In Dallas Electric Supply Co. v. Branum Co., 143 Tex. 366, 185 S.W.2d 427 (1945), the Supreme Court said:

"It follows that there is no basis for the application of the doctrine of quantum meruit in this case. A recovery on that ground would be a recovery of what the agent's services were worth. The contract expressly covered that subject * * *. The amount of compensation was not left to implications, but was definitely fixed. For the court to determine what the agent's services were worth would be for it to make a contract for the parties. That, of course, it cannot do."

In Deal v. Craven, 277 S.W. 1046 (Tex. Com.App.1925), the opinion reflects that in answer to special issues the jury found that the plaintiff (subcontractor) constructed a road in substantial compliance with plans and specifications and that the work was accepted as complete by an engineer (designated in the contract as one whose decisions on all questions arising out of performance of the work would be final). The jury further found the defendant (general contractor) expended $1,160.63 on the work in order to meet the requirements of his contract with the county. The trial court deducted this amount, together with the payments previously made, from the total contract price as found by the jury and granted judgment for the plaintiff in the resulting amount. This judgment was affirmed by the Court of Civil Appeals, but the Supreme Court reversed and rendered judgment for the plaintiff for the contract price less sums paid. The Court said:

The plaintiff pleaded a strict compliance with the terms of his contract, and likewise, in the alternative, he pleaded a substantial compliance, but in view of the verdict upon issue No. 2, no judgment other than one for the plaintiff

could be entered. It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue. This is the correct practice, even to the extent of those cases where the verdict is contrary to the undisputed evidence. In such a case the court has the alternative of setting aside the verdict, but until such action is taken, no judgment can be entered contrary thereto. Ablowich v. [Greenville Nat.] Bank, 95 Tex. 429, 67 S.W. 79, 881. The parties to this suit, by the contract duly pleaded and proved, agreed specifically that the decision of the county engineer of Fort Bend county on all questions arising out of the performance of the work contemplated should be binding upon them. In response to special issue No. 2 the jury found that the engineer had fully accepted as complete the construction work which the plaintiff had contracted to do, and in response to issue No. 3 they found the total amount due. In view of these findings, the other findings become immaterial. Those referred to are absolutely conclusive of the case, and upon them the plaintiff was entitled to judgment for the amount found in response to issue No. 3, less, of course, the admitted credit pleaded by plaintiff."

In Cox v. KTM Drilling, Inc., 395 S.W.2d 851 (Tex.Civ.App.—Amarillo 1965, ref., n. r. e.), the court affirmed the judgment of the trial court granting full contract price to the contractor and against the owner where the contract had been substantially performed and an attempted complete performance was prevented when the owner refused to permit the contractor to use a pump which the owner was obligated by the contract to furnish. The court held:

"It is elementary that where a contract has been substantially performed and an attempt to complete performance is refused the refusal excuses any further at-

tempts on the part of the party offering performance."

In this case issues answered by the jury establish substantial performance on the part of the contractor and that full performance was excused by reason of the owner's conduct. The jury found the full contract price. The balance due can be calculated from undisputed facts. While there was a claim for extra work and evidence was introduced, there were no issues answered on which a judgment for the extra work can be based.

The judgment of the Trial Court based on the quantum meruit issues exceeds the balance due on the contract price. It is my opinion that judgment should have been entered for the contract price, less the sums already paid, resulting in a judgment for the appellee in the sum of $16,079.09, and that, therefore, the judgment of the Trial Court should be reversed and judgment rendered for such amount.

I respectfully dissent.